580

471 A.2d 719

ROSECROFT TROTTING & PACING ASSOCIATION, INC.
et al.

v.

PRINCE GEORGE'S COUNTY, Maryland et al.

METROVISION of PRINCE GEORGE'S COUNTY, INC.

v.

PRINCE GEORGE'S COUNTY, Maryland et al.

Nos. 145, 146 and 147, Sept. Term, 1983.

Court of Appeals of Maryland.

March 6, 1984.

James C. Chapin, Bethesda (John C. Joyce, Bethesda, and Richard S. Alper, Upper Marlboro, on brief), for appellants James C. Chapin and John C. Joyce, Attorneys for the Public Interest.

John R. Miles, Mark L. Chester and O'Malley, Miles, McCarthy, Harrell & Levin, Upper Marlboro, on brief, for appellant Rosecroft Trotting & Pacing Ass'n, Inc.

William D. Shapiro, Washington, D.C., for appellant, Potomac Elec. Power Co.

Larnzell Martin, Jr., Upper Marlboro (Russell W. Shipley and Shipley, Curry & Taub, P.A., Landover, on brief), for appellant, Metrovision of Prince George's County, Inc.

David S. Bliden, Assoc. County Atty., Upper Marlboro (Thomas P. Smith, County Atty., Michael O. Connaughton and Barbara L. Holtz, Deputy County Attys., Upper Marlboro on brief), for appellees.

James A. Biddison, Jr., and Michael D. Rind, Baltimore, on brief, for amicus curiae Baltimore Gas and Elec. Co.

Shale D. Stiller, Jay I. Morstein, William L. Reynolds, Evelyn W. Pasquier and Frank, Bernstein, Conaway & Goldman, Special Counsel and J. Cookman Boyd, Jr., Gen. Counsel, Baltimore, on brief, for amicus curiae Maryland Chamber of Commerce.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and ORTH, CHARLES E., Jr., Retired, Specially Assigned Judge.

RODOWSKY, Judge.

By Council Resolution 86–1983 of June 28, 1983, Prince George's County, Maryland (Prince George's) levied its property tax for fiscal 1984 at the countywide rate of $2.54 per $100 of assessed valuation on real property and at the countywide rate of $3.57 per $100 on personal property. Taxpayers of personal property taxes assert the higher rate is void for lack of power in a county to levy two rates in the same district, and we agree. Prince George's claim of authorization rests on a provision of the Express Powers Act. Even if that provision is interpreted to support the county's position, operation of the provision would be suspended because of conflict with a later public general law.

Prince George's is a charter county. On November 7, 1978 its voters ratified a charter amendment which had been initiated by petition and which reads in part as follows:

> The Council shall not levy a real property tax which would result in a total collection of real property taxes greater than the amount collected in fiscal year 1979 . . . . [Charter, Article VIII, § 817B(a), Prince George's County, Maryland Code Part I (1979, 1981 Supp.).]

This new charter section is known as the "TRIM" amendment. When levying two rates for fiscal 1984 the county council was limited by TRIM in fixing the rate on real property. Resolution 86–1983 in effect provides that if dual property tax rates are not permitted, the lower rate set for real estate is to apply to all taxable property.

There are before us appeals in three cases. They are sequels to *Potomac Electric Power Co. v. Prince George's County,* 298 Md. 185, 468 A.2d 325 (1983). That was a declaratory judgment action in which Potomac Electric Power Company (PEPCO) had challenged Prince George's power to set two tax rates. We dismissed because PEPCO had paid its taxes. The opinion in the PEPCO case was filed December 22, 1983. On December 30, 1983 Rosecroft Trotting & Pacing Ass'n, Inc. (Rosecroft) instituted a declaratory judgment action attacking the higher personal property tax rate.[1] Rosecroft has not paid its county personal property taxes for fiscal 1984. PEPCO was permitted to intervene on the side of Rosecroft. The other two cases before us involve Metrovision of Prince George's County, Inc. (Metrovision), a cable television company, and Prince George's. In one case the county sues Metrovision for unpaid taxes; in the other Metrovision seeks a declaratory judgment that the higher personal property tax rate is invalid.

The principal legal analysis which Prince George's presents in support of its two tax rates embraces three steps. First, Art. XV of the Maryland Declaration of Rights, insofar as it requires uniformity in property taxation, is satisfied by a rate that is uniform within a class of property. There is no constitutional prohibition against different rates between reasonable classifications. Second, the power to adopt separate rates for separate classes is conferred on Prince George's County by a provision of the Express Powers Act. Third, the General Assembly has separately classified real estate and personal property. Prince George's says it has simply applied its Home Rule power to existing legislative classifications. The appellants on the other hand

---

1. Prince George's disclosed to the circuit court that Rosecroft's action was a collusive suit. Thereafter the court and parties proceeded in accordance with their understanding of the rules laid down in *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977). As a result the position adverse to the county in the Rosecroft case has been briefed both by counsel who appear on behalf of Rosecroft and by attorneys whom the circuit court "appointed as counsel for the public interest . . . ."

principally rely on provisions of Md.Code (1957, 1980 Repl. Vol.), Art. 81, Title, "Revenue and Taxes," which they say are controlling. Subject to exceptions created by the General Assembly, those Art. 81 provisions require county property taxes for any particular year to be fixed at a single rate for all property for which the county is empowered to set the rate. Prince George's responds that the taxpayers have mistakenly concluded from Art. 81's use of words like "rate," or "levy," expressed in the singular, that only one rate is permissible. Because the singular includes the plural in statutory drafting, Prince George's sees no impediment in Art. 81.

The circuit court agreed with the legal contentions of Prince George's and entered final judgments favorable to it. We granted certiorari prior to consideration by the Court of Special Appeals of the appeals entered by the taxpayers.

(1)

For its authority to levy using two rates Prince George's points to the first paragraph of § 5(O) of the Express Powers Act, Md.Code (1957, 1981 Repl.Vol.), Art. 25A, § 5(O). That paragraph (the § 5(O) paragraph) provides that a charter county has power

[t]o direct the class or subclass of improvements on land and personal property which shall be made subject to the county tax levy, and to provide for the levy thereupon and upon the value of land in accordance with Article 15 of the Declaration of Rights of the Constitution of Maryland as amended, of any sum which may be necessary to pay and discharge the principal and interest of any loan which may heretofore have been obtained, or which may hereafter be obtained by such county, according to law, and to create a sinking fund to meet the liabilities thus incurred, and levy upon the property so subject to taxation from time to time such sums as may be necessary to provide therefor; as well as to collect from such property so subject to the levy such sums as may be necessary for the support and maintenance of the county government.

The provision was first enacted by Ch. 456 of the Acts of 1918. Prince George's bolsters its interpretation of the § 5(O) paragraph by reference to a 1915 amendment to Art. XV of the Declaration of Rights. The two provisions contain textual similarities which are best explained if viewed historically. Woven through the history is the concept of the Single Tax.

The Single Tax movement in the United States had its origin with the publication in 1879 by Henry George of *Progress and Poverty.* Single Taxers advocated that only land values should be taxed.[2] One of those who accepted this philosophy was Jackson H. Ralston (Ralston), an attorney who practiced in Washington, D.C. but who was domiciled in Hyattsville, Maryland.[3] Ralston was president of the Board of Commissioners for Hyattsville when Ch. 285 of the Acts of 1892 provided for a reassessment for that town's purposes from which personal property was excepted. Upon receipt of the assessment roll, which separately valued land and improvements, the board's majority, composed of Ral-

---

2. A National Conference of the Single Tax League of the United States, held at Cooper Union, New York, on September 3, 1890, adopted a Single Tax platform which in part declared:

> We hold that all men are equally entitled to the use and enjoyment of what God has created and of what is gained by the general growth and improvement of the community of which they are a part. Therefore, no one should be permitted to hold natural opportunities without a fair return to all for any special privilege thus accorded to him, and that value which the growth and improvement of the community attach to land should be taken for the use of the community.

> We hold that each man is entitled to all that his labor produces. Therefore no tax should be levied on the products of labor.

> To carry out these principles we are in favor of raising all public revenues for national, state, county and municipal purposes, by a single tax upon land values, irrespective of improvements, and of the abolition of all forms of direct and indirect taxation. [A. Young, *The Single Tax Movement in the United States* app. A at 321–22 (1916).]

The 1890 platform was reaffirmed at the 1912 Single Tax Conference. *Id.* at 321.

3. Publisher's Note to J. Ralston, *Confronting the Land Question* at viii (1945), hereinafter referred to as "Publisher's Note."

ston and two others, levied the municipal property tax only on the land. A resulting mandamus action was dismissed on procedural grounds. *Wells v. Hyattsville,* 77 Md. 125, 26 A. 357 (1893). But, in *dicta,* the Court made it unmistakably plain that the Act of 1892 and the intentional omission of improvements from the levy were unconstitutional under the then form of Art. XV of the Maryland Declaration of Rights.

At that time Art. XV in relevant part provided:

[E]very person in the State, or person holding property therein, ought to contribute his proportion of public taxes for the support of the Government, according to his actual worth in real or personal property .... [4]

Article XV was changed by an amendment ratified November 2, 1915. The above-quoted language was deleted and the following substituted:

[T]hat the General Assembly shall, by uniform rules, provide for separate assessment of land and classification and sub-classifications of improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform as to land within the taxing district, and uniform within the class or sub-class of improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy ....

---

**4.** The Court said, in part, that the theory underlying this formulation of Art. XV was

that the distribution of the burden over every class of property alike, will lessen the proportion of each individual's contribution, whereby oppressive exactions from the owners of any particular class of property will be impossible.... Eminently just in itself as a sound and long accepted axiom of political economy, it has been incorporated in [Maryland's] organic law since November 3, 1776; it has been upheld by her courts and steadily and tenaciously adhered to by her conservative people. [77 Md. at 138, 26 A. at 359–60.]

Lewis, *The Tax Articles of the Maryland Declaration of Rights,* 13 Md.L.Rev. 83, 102 (1953) includes among the changes made by the 1915 amendment the following:

[a]  Under the amendment, the Legislature is required to provide for the separate assessment of land and improvements;  formerly there was nothing in the Constitution to prevent the assessment of land and improvements as a unit.

[b]  Classification is authorized as to improvements and personal property, although not as to land.

[c]  Taxes must be uniform as to land within each taxing district, and as to personal property and improvements within each classification, but there is no longer any constitutional requirement of overall uniformity of tax burden.

[d]  The amendment authorizes the exemption of classes of improvements and personal property and is broad enough to permit the exemption of *all* improvements and personal property.  No exemption is, however, authorized as to land.  [Emphasis in original.[5]]

The 1915 change in Art. XV removed to some extent the previously existing bar to the exercise by the General As-

---

5.  According to the Publisher's Note at viii-ix, after the *Wells* decision, Maryland Single Taxers under the leadership of Judge Alfred S. Niles of Baltimore sought a constitutional amendment granting home rule in taxation but the General Assembly would never approve the same.

Then the plan occurred to Ralston to draft an amendment providing for the classification of all taxable property in the state, which should include land and be uniform within the classes of other property the legislature or the several counties should direct to be taxed, leaving the field as to towns untouched.  This, after some delays, the legislature submitted to the people and in 1915 it became ... part of the Constitution of the State.  [Publisher's Note at ix.]

H.H. Walker Lewis reports in his article, 13 Md.L.Rev. at 101 n. 43, that Judge Oscar Leser also attributed the 1915 amendment of Art. XV to Ralston and the Single Taxers.  Leser was "for many years the dominant figure on the Appeals Tax Court of Baltimore City and later on the State Tax Commission," when that agency was established in 1914.  *Id.* at 100.

sembly of the power of reasonable classification which is incidental to the inherent power of the State to tax. *See State Tax Comm'n v. Gales,* 222 Md. 543, 549, 161 A.2d 676, 678–79 (1960) (holding that Art. XV, as amended in 1915, still limited the power of the General Assembly to classify land for tax purposes). Prior to 1915, when Art. XV had required taxes to be apportioned in accordance with the actual worth of the taxpayer in real or personal property, it "necessarily meant uniformity of assessment as well as uniformity of tax rates." *National Can Corp. v. State Tax Comm'n,* 220 Md. 418, 425, 153 A.2d 287, 291 (1959), *appeal dismissed,* 361 U.S. 534, 80 S.Ct. 586, 4 L.Ed.2d 538 (1960). After the 1915 amendment, the appropriate test of the power of the General Assembly to classify became "the reasonableness of the classification rather than the method by which a difference in the amount of taxes is effected— whether by a difference in percentage of assessment or by a difference in the rate of taxation applicable to the respective classes." *Id.* [220 Md.] at 429, 153 A.2d at 293. And *see* 37 Op. Att'y Gen. Md. 424, 433 (1952) ("It is well settled that Article 15, as amended [in 1915], does not deny the Legislature the power to classify property for purposes of establishing different rates of taxation on different classes of property.").[6] For Prince George's to succeed here, its power to set a property tax rate or rates cannot be more restricted than that of the General Assembly.

At the November 2, 1915 election Maryland voters also adopted Constitution Art. XI–A, the Home Rule Amendment. Art. XI–A, § 2 states that "[t]he General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter . . . . " Ch. 456 of the Acts of 1918 added Art. 25A,

---

6. This opinion was rendered by then Attorney General Hall Hammond, with Assistant Attorney General Robert M. Thomas. Judge Hammond was a member of this Court at the time of *National Can* and joined in the majority opinion authored by Chief Judge Brune.

the Express Powers Act, to the Code of Public General Laws. It contained the § 5(O) paragraph.[7]

Consistent with Art. XV as it stood in 1918, the language of the § 5(O) paragraph contemplates that land will always be subject to the county tax levy and will not be subject to classification by the General Assembly. Further, a charter county may "direct" the class or subclass of improvements and personal property which may be made subject to the county tax levy. If the § 5(O) paragraph were the only provision bearing on the matter, it is this power to "direct" which would have to be interpreted to authorize separate tax rates in order for Prince George's to prevail here.

Another public general law occasioned by the 1915 amendment of Art. XV dealt with municipalities. Ch. 656 of the Acts of 1916 provided that municipalities "shall likewise have the power ... to determine the classes of property which shall be the subject of taxation ... for their local purposes ...." Ch. 656 also authorized a municipality to exceed any ceiling imposed by its charter on the rate of property tax in order for the town to cover revenue loss occasioned by any exemption granted to classes or subclasses of property.[8]

---

7. The Publisher's Note at x advises that "[i]n 1915 Ralston was appointed by Governor Harrington member of a committee to frame legislation making county home rule operative in Maryland. His draft, accepted with slight changes by the committee, was enacted by the legislature."

8. Ch. 656, § 1 in its entirety read:
   That all incorporated towns within this State be, and the same are hereby directed to follow for local purposes the rules for uniform taxation within their respective jurisdictions as to land and uniform taxation within each class or subclass of improvements and personal property as provided for the levying of State, County and City taxes by the amendment to Article 15 of the Declaration of Rights of the Constitution of Maryland, as contained in Chapter 390 of the Acts of 1914 and adopted by the people of Maryland in the General Election of 1915. And the said incorporated towns shall likewise have the power, anything in their charters granted to them to the contrary notwithstanding, but subject to the Public General Laws of the State, to determine the classes of property

Article XV was next and most recently amended in 1960, to alter the result in *State Tax Comm'n v. Gales, supra. Gales* held that land could not be classified under the 1915 version of Art. XV. The constitutional limitation was violated by a statute which required land devoted to agricultural use to be assessed at less than full cash value, while other land was assessed at full cash value. In 1960 the uniformity clause of Art. XV was modified to read:

> [T]hat the General Assembly shall, by uniform rules, provide for the separate assessment, classification and subclassification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy . . . .

The third element of Prince George's argument requires realty and personalty to have been separately classified in order for different rates to operate on the separate classes. In its principal analysis on this aspect, Prince George's looks to a classification effected by the General Assembly in Art. 81, § 14(a). It provides: "Real and personal property shall be separately classified and subclassified for assessment

---

which shall be the subject of taxation within their respective jurisdictions and for their local purposes; provided, however, that they follow the rules of classification for taxation as established by said Article 15 and any supplementary legislation enacted in conformity therewith; and provided further that they shall have the right through their appropriate authorities, the necessity existing, to change the tax rate fixed by their respective charters upon the property taxed to the extent of covering any loss of revenue in case they may determine upon the exemption or partial exemption of certain classes or sub-classes of property.

We are informed by the Publisher's Note at ix that Ralston drafted this statute.

purposes as provided in this article." [9]   In taxpayers' view the § 14(a) classification is exclusively a response to *Sears, Roebuck & Co. v. State Tax Comm'n,* 214 Md. 550, 136 A.2d 567 (1957).  *Sears* had held that Equal Protection was violated by the systematic assessment of realty below full cash value while tangible personal property was assessed as full cash value.  Consequently, appellants assert § 14(a) by its terms separately classified real estate and personal property only "for assessment purposes," and that, as limited to assessments, § 14(a) cannot be the predicate for separate rates.  We shall assume, *arguendo,* that if a charter county has power to levy at separate rates on separate classes of property, § 14(a) affords a sufficient classification of property for that type of levy.

In order for the § 5(O) paragraph to be read as authorizing a charter county to levy at different rates on the classes and/or subclasses created by § 14(a), the § 5(O) paragraph would have to be construed to include the following: (1) to "direct" the inclusion of classes or subclasses in the levy encompasses power to exclude other classes or subclasses; (2) a power fully to exclude selected classes or subclasses includes a power partially to exempt any class or subclass; and (3) a power partially to exempt any class or subclass would include the power to impose a lower rate of taxation on any class or subclass.  *Cf. State Tax Comm'n v. Gales, supra,* 222 Md. at 550, 161 A.2d at 679 ("In the case of *ad valorem* taxes, the application of *a lower rate of* assessment or *taxation* to one or more classes of property than to others sets up a classification which operates practically to grant a partial exemption in favor of the class or classes subject to the lower rate." (Emphasis added)).  We shall assume,

---

9.  Additionally and alternatively Prince George's contends (1) that Art. XV of the Declaration of Rights establishes the major classes of land, improvements and personal property;  or (2) that a charter county under the § 5(0) paragraph has the power to classify.  Appellants contend that (1) Art. XV is not self-executing in effecting classifications and that (2) a charter county has power to "direct" for rate differentials only with respect to classes created by the General Assembly for tax rate purposes.

*arguendo,* that Prince George's clears each of these hurdles. Even then, there is another obstacle to the county's position in construing § 5(O).

■ The § 5(O) paragraph was not amended when Declaration of Rights Art. XV was amended in 1960. Consequently, the § 5(O) paragraph can be read to mean land may not be classified by a charter county. The difficulty then arises that the lower of the two rates is the one which Prince George's applies to real estate, a class which includes land. In the universe of property on which ordinary taxes have been imposed, property enjoying the lower rate under a two-tiered levy can be viewed as having been classified separately from the main body of property which is taxed at the higher rate. Because the § 5(O) paragraph seemingly tracks the 1915 version of Art. XV, which would never have allowed a county to "direct" that land not be subject (wholly or partially) to the county levy, the § 5(O) paragraph can be read as operating diametrically opposite to the result Prince George's seeks. However, inasmuch as the § 5(O) paragraph empowers a charter county "to provide for the levy ... upon the value of land in accordance with Article 15 ... as amended" we shall assume, *arguendo,* that the 1960 amendment in Art. XV expanded a charter county's assumed power to levy at two rates so as to permit land to be, or be included in, the class enjoying the lower rate. All of these assumptions as to the interpretation of the § 5(O) paragraph are essential to sustain the principal argument made by Prince George's. However, that interpretation places the § 5(O) paragraph in irreconcilable conflict with Art. 81, § 30(a).

(2)

Section 30 is the only section in Art. 81 comprising the subtitle, "Rate of Tax." Subsection (a), which is of principal relevance to the instant matter, reads:

(a) *Full county and city rate.*—Except as hereinafter in this section provided and as provided in § 12, *all property*

subject to ordinary taxation in this State *shall pay* the *full* county and/or city rate prevailing for the time being in the county and/or city in which under this article the same is taxable; provided that nothing in this article contained shall affect any special rates prevailing under existing local laws in any taxing district or part of any county or city. [Emphasis added.]

A county property tax levy under which different rates are fixed for separate classes of property cannot exist compatibly with § 30(a). Prince George's argues the singular of the word "rate" may be read to include the plural under the rule of interpretation of Md.Code (1957, 1981 Repl.Vol.), Art. 1, § 8 which provides that "[t]he singular always includes the plural, and vice versa, except where such construction would be unreasonable." In § 30(a) inclusion of the plural would be unreasonable. To construe "rate" as including "rates" would mean that an imposition of two or more different dollar amounts per $100 of valuation was consistent with § 30(a). But two or more different rates would mean that one or more rates is/are less than one or more other rates. The class of property to which a lesser rate is applied would result in less than all property subject to ordinary taxation paying the full county rate. Section 30(a) states that all property "shall pay" the full rate.

This literal reading of § 30(a) produces a conflict with the interpretation by Prince George's of the § 5(O) paragraph which we assumed, *supra.* That conflict should be avoided and the two sections reconciled, if reasonably possible. The two sections would be reconciled if § 30(a) could be read to mean only that the full rate applicable to a class of taxable property is to be paid by all taxable property within that class. However, § 30(a) cannot carry that construction because of the exception in § 30(a) of Art. 81, § 12. In relevant part § 12 provides:

Any incorporated town in this State shall have power (a) to select as the subjects of town taxation such classes of personal property, of land, or improvements on land, assessable under this article, as it may deem wise, and (b)

to levy such special or limited rates of town taxation as it may deem wise on any class of property so selected as a subject of town taxation for which a fixed or limited rate of town taxation is not prescribed by this article. Provided that all such town taxes shall be levied upon assessments made pursuant to this article by the county commissioners of the county in which such town is situated or by the State Department of Assessments and Taxation . . . .

Section 12 in express terms provides, but only for municipalities, the type of authorization which Prince George's seeks to achieve under the § 5(O) paragraph. The General Assembly found it necessary specifically to exclude from § 30(a) the provisions of § 12 because the use of different tax rates for different classes of property is incompatible with § 30(a)'s requirements. Consequently, § 30(a) cannot reasonably be read as imposing on counties only a requirement that all property within a class pay the full county rate for that class.[10]

This conclusion is also confirmed by the exception in § 30(a) for those matters "hereinafter in this section provided . . . ." That exception dates back to the revision of Art. 81 by the Acts of 1929, Ch. 226, in which present § 30(a) was § 27(a). At that time the property tax included a broad range of intangibles. Former § 27, as enacted, had seven subsections in addition to subsection (a). Among the mat-

---

**10.** Section 12 is a successor to the Acts of 1916, Ch. 656, which "directed" municipalities to follow the 1915 amended version of Declaration of Rights Art. XV. In the revision of Art. 81 by Ch. 226 of the Acts of 1929, a portion of the 1916 statute was placed in the predecessor to present § 12 and the remainder was placed in the predecessor to present § 30(b). Present § 30(b) reads:

(b) *Power of incorporated town to change rate fixed by charter.* —Any incorporated town shall have the power to change the tax rate fixed by its charter upon property taxed under § 12 of this article to the extent of covering any loss of revenue in case it may have determined upon the exemption or partial exemption of certain classes or subclasses of property under said section, or may have determined upon any special or limited rates of town taxation thereon.

ters covered by those subsections were: a limit of 30¢/$100 for county and city property taxes, combined, on (1) interest-bearing bonds and notes owned by residents and issued by domestic corporations, (2) interest-bearing mortgages on realty or tangibles situate in whole or in part outside of Maryland, and (3) dividend-paying shares owned by residents in foreign corporations (subsection (b)); a limit of $1/$100 on bank shares of stock for county and city purposes, combined (subsection (c)); a limit of $1/$100 on the shares of stock of certain domestic insurers, for county and city purposes, combined (subsection (d)); and a limit of $1/$100 on shares of stock of domestic finance corporations, for county and city purposes, combined (subsection (e)). Imposition of these limits on the rate of county property tax as applied to certain intangibles meant that those intangibles would not be taxed at "the full county" rate, as required by subsection (a), if that "full" rate were higher. It was considered necessary for subsection (a) to contain an exception from its rule that all property be taxed at the full rate in order to accommodate the lower rates on designated classes of intangibles.

In the 1929 form of present § 30, subsection (f) provided for allocating among taxing authorities the amount collected under the $1/$100 limit for combined county and city taxes on the intangibles described in then subsections (c), (d) and (e). The limited amount payable was to "be apportioned between such city and the county in which such city is situated in the proportion which the *full county tax rate . . .* and the full city tax rate respectively bears [*sic*] to the total amount so payable for both county and city taxes on such property." (Emphasis added.) Once again, the statute contemplated that, subject to exceptions, there would be a certain, fixed county rate of property tax. That is the full rate which is still referred to in present Art. 81, § 30(a).

Reference has been made by Prince George's to municipal tax differentials in county property taxation and to the multiple property tax rates which were in effect in the past in areas annexed by Baltimore City. These deviations from

a full county rate do not detract from the conclusion which we reached above. Municipal tax differentials in a county's property tax mean that lower rates of county property tax are respectively imposed by a county on taxable property within the municipalities in that county than are imposed by the county on taxable property situate in those areas of the county outside of any municipality. As a theoretical ideal, the differential reflects the difference between the cost to the county of rendering service in the extra-municipal area of the county and the lower cost to the county of the more limited services rendered by the county in a given municipality where the municipal government itself furnishes certain services in lieu of the county. In a county in which there is only one municipality which provides services the result is two rates of county tax, one in that municipality and a higher rate in the extra-municipal area. So far as the record shows and our research reflects, whenever a municipal tax differential has in fact been made, it has been done on the basis of the geographical situs of taxable property of all classes and not on the basis of classes of property. In any event, for present purposes, it is significant that Art. 81, § 32A, a public general law first enacted in 1975, (Chs. 715 and 887), authorizes counties, including charter counties, to grant municipal tax differentials. This is entirely consistent with our interpretation of § 30(a) because the authority to deviate from a full county rate is provided by a public general law enacted after § 30(a) was enacted.

Superficially inconsistent with our interpretation of § 30(a) is *Griffin v. Anne Arundel County,* 25 Md.App. 115, 333 A.2d 612, *cert. denied,* 275 Md. 749 (1975). That litigation was an unsuccessful attempt by taxpayers in the City of Annapolis to compel Anne Arundel County, a charter county, to grant taxpayers in Annapolis a larger municipal tax differential. For the tax year involved in *Griffin* there was no public general law authorizing a municipal tax differential, but both the parties and the Court of Special Appeals seemingly assumed that a county could grant a differential if it so decided. The assumption inferred from the silence of

the *Griffin* opinion was to some extent relied on in later opinions of the Attorney General of Maryland on questions resulting from the adoption of TRIM. *See* Opinion No. 83–008 (February 15, 1983) (unpublished, adopting a "one signature" opinion of February 3, 1983); and 64 Op. Att'y Gen.Md. 28 (1979). Neither *Griffin* nor the Attorney General considered § 30(a) which we find dispositive.

The 1888 and 1918 annexations by Baltimore City also resulted in different rates of property tax being in effect in different parts of Baltimore City and, indeed, in different rates being applied to different classes of property in the same district. This history is reviewed in *State Tax Comm'n v. Gales, supra,* 222 Md. at 552–56, 161 A.2d at 680–82. What is relevant to the case before us is that the different rates were required by statutory provisions applicable only to Baltimore City and enacted before the predecessor to present § 30(a) was enacted in 1929. As a consequence, Acts of 1929, Ch. 226, § 27(a) contained the proviso "that nothing in this Article contained shall affect any special rates prevailing under existing local laws in any taxing district, or part of any county or city, or upon any class or classes of property in any taxing district, or part of any county or city." This proviso excepts the different rates in Baltimore City's annexed territories from the general rule of present § 30(a), so that the annexation illustrations are not inconsistent with our interpretation of § 30(a). Indeed, the limitation of the exception to rates prevailing under "existing" local laws simply magnifies the conflict between § 30(a) and the interpretation by Prince George's of the § 5(O) paragraph.

Thus, we are faced with a conflict between the county's interpretation of the § 5(O) paragraph and Art. 81, § 30(a). It is a conflict between two public general laws, one of which is a provision of the Express Powers Act.

(3)

Art. 81, § 30(a) is the later public general law as reflected by the chronology below.

Acts of 1918, Ch. 456—Express Powers Act enacted. The § 5(O) paragraph is included as § 3(P).

Acts of 1929, Ch. 226—§ 30(a) is enacted. Section 14 of Ch. 226 provided that "all Acts and parts of Acts, whether Public General, Public Local, or Special, . . . inconsistent with the provisions of this Act, be and they are hereby repealed to the extent of such inconsistency . . . ."

Acts of 1949, Ch. 646—the entire section containing the § 5(O) paragraph is repealed and re-enacted in order to amend the section by the addition of two paragraphs.

Acts of 1968, Ch. 452—§ 30(a) is included in the repeal and re-enactment with amendments of § 30 as part of the repeal of the property tax on shares of stock of certain financial institutions and the enactment of a franchise tax on the net earnings of financial institutions. There is no change made in § 30(a) from the form in which it appeared in the Codes of 1951 and of 1957. Section 7 of Ch. 453 contains an express repealer of inconsistent public general or public local laws, to the extent of the inconsistency.

### (4)

■ Where a conflict exists between the Express Powers Act and another public general law, the other public general law controls, at least where it is the later of the two. Const. Art. XI–A, § 2, after providing that "[t]he General Assembly shall by public general law provide a grant of express powers," further provides that "such powers may be extended, modified, amended or repealed by the General Assembly." The limitation in Art. XI–A, § 4 on the General Assembly's legislating for a charter county states that "no public local law shall be enacted by the General Assembly for said City or [charter] County on any subject covered by the express powers granted as [provided by § 2]." Art. 81, § 30 is a public general law to which the § 4 limitation is inapplicable.

■ This Court has previously decided cases in which a public local law enacted by a charter county conflicted with a public general law so that, under the rule provided in Art. XI–A, § 3, the public general law prevailed. *See, e.g., Rockville Grosvenor, Inc. v. Montgomery County,* 289 Md. 74, 422 A.2d 353 (1980). When a provision in a county charter conflicts with a public general law, the public general law prevails under Art. XI–A, § 1. *See, e.g., East v. Gilchrist,* 296 Md. 368, 463 A.2d 285 (1983). Also, cases have arisen in which a public local law enacted by the General Assembly for an Art. XI–A subdivision conflicted with an express power so that the enactment by the General Assembly was invalid under Art. XI–A, § 4. *See, e.g., State's Atty v. City of Baltimore,* 274 Md. 597, 337 A.2d 92 (1975). However, it seems we have not previously decided the rule which applies when a provision of the Express Powers Act confers a power, which, if exercised, conflicts with a later public general law. We hold that the later public general law prevails and suspends exercise of the conflicting power conferred on the Art. XI–A subdivision. This is so even if the power is one which a charter county is to exercise by means of the property tax levy, and even if the property tax levy is not a "local law" within the meaning of the last sentence of Art. XI–A, § 3. *Cf. Schneider v. Lansdale,* 191 Md. 317, 61 A.2d 671 (1948) (holding that the adoption of a budget and tax levy by a charter county is not "legislation," within the meaning of that portion of Art. XI–A, § 3 which limits the number of days in each year during which a county council may sit "for the purpose of enacting legislation . . . .").

The rule that a later public general law prevails over and suspends exercise of a conflicting power is found in the Express Powers Act. Two paragraphs, now codified as if they were segments of Art. 25A, § 5(S), read in relevant part as follows:

> The foregoing or other enumeration of powers in this article shall not be held to limit the power of the county

council ... to pass all ... resolutions ... not inconsistent with ... the laws of the State ....

Provided, that the *powers herein granted shall only be exercised to the extent that the same are not provided for by public general law* .... [Emphasis added.]

Subsection (S) deals with ordinances facilitating charter amendments. In the original enactment by Ch. 456 of the Acts of 1918 of the Express Powers Act present § 5(S) was § 3(T). Subsection (T) set forth the last of the enumerated powers and the section concluded with the two paragraphs from which we quoted above. Those two paragraphs are clearly intended to apply, at a minimum, to all of the express powers set forth in the 1918 Act. Those include the § 5(O) paragraph.

The analysis in *State's Atty v. City of Baltimore, supra,* 274 Md. 597, 337 A.2d 92 also leads to Art. 81, § 30(a) as prevailing. That case involved the "General Powers" provisions of the Baltimore City Charter which, for purposes of Art. XI–A, § 4, are the grant of express powers to Baltimore City. Pursuant to those powers the City had enacted building and electrical codes which made violations thereof criminal offenses. By a statute applicable only to Baltimore City the General Assembly said trials of alleged violations of those building and electrical codes would be civil proceedings. We held that the enactment by the General Assembly was a public local law and was void. It was argued in defense of the General Assembly's enactment that it was a public general law. Had that been the case, *State's Atty* indicates that the General Assembly's enactment would have prevailed. We said:

Under Art. XI–A, § 4, of the Maryland Constitution, the General Assembly may enact legislation inconsistent with the express powers it had previously granted to Baltimore City or to the charter counties if it does so by *public general law.* The restriction upon the authority of the General Assembly in § 4 of Article XI–A relates to the enactment of *public local laws* only. [274 Md. at 606, 337 A.2d at 98 (emphasis in original).]

And see *State v. Stewart,* 152 Md. 419, 423–24, 137 A. 39, 41–42 (1927); Moser, *County Home Rule—Sharing the State's Legislative Power with Maryland Counties,* 28 Md.L. Rev. 327, 333–34 (1968) (the power of a charter county or Baltimore City to enact, repeal or amend local laws dealing with matters falling within their express powers is subject to the general laws of the state).

Indeed, the rule could hardly be otherwise. When enacting a public general law the General Assembly cannot be impeded by the possibility that its subject matter conflicts with a power previously granted under the Express Powers Act.

In the instant matter Art. 81, § 30(a) requires, subject to exceptions not here relevant, that a county property tax be imposed at a single rate on all property subject to that levy. The § 5(O) paragraph authorizes, we assume, two rates. In the face of § 30(a) Prince George's may not exercise its claimed power to levy at two different rates on separate classes.

If Prince George's derives its power to levy property taxes from Art. 81, the result in this case would be the same because § 30(a) would still control. Similarly if the § 5(O) paragraph, by its terms, encompasses a power for a charter county to classify property for tax *rate* purposes, exercise of that power would face the same obstacle in § 30(a).

JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IN EQUITY NOS. '83–1968 AND '84–0068 VACATED AND THOSE CASES REMANDED TO THAT COURT FOR THE ENTRY OF DECLARATORY JUDGMENTS AND FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IN LAW NO. '83–6302 REVERSED AND REMANDED.

COSTS TO BE PAID BY APPELLEES.