608 A.2d 1222

BOARD OF SUPERVISORS OF ELECTIONS
OF ANNE ARUNDEL COUNTY et al.

v.

Rayburn H. SMALLWOOD et al.

BALTIMORE COUNTY CITIZENS FOR REPRESENTATIVE
GOVERNMENT, et al.

v.

BALTIMORE COUNTY, Maryland, et al.

Nos. 71 & 72, Sept. Term, 1990.

Court of Appeals of Maryland.

Sept. 20, 1990 (Order).

July 17, 1992 (Opinion).

John R. Greiber, Jr. (Messinger & Greiber, both on brief), Annapolis, for petitioners Bd. of Supervisors, Richard W. Drury (Thomas G. Bodie, Thomas J. Dolina, Power & Mosner, P.A., all on brief), Towson, for petitioners Baltimore County Citizens.

Diana G. Motz, and Frank, Bernstein, Conaway & Goldman, Baltimore, amicus curiae, for Talbot County Taxpayers' Ass'n and the Tax Reform Initiative by Marylanders.

Roger D. Redden (Kurt J. Fischer, both on brief), Baltimore, David A. Plymyer, Deputy County Atty. (Stephen R. Beard, County Atty., both on brief), Annapolis, for respondents Smallwood, Roger D. Redden (Kurt J. Fischer, both on brief), Baltimore, Arnold Jablon, Co. Atty. (Stanley J. Schapiro, Deputy Co. Atty., Michael J. McMahon, Asst. Co. Atty., all on brief), Towson, for respondents Baltimore County.

Argued before MURPHY, C.J., ELDRIDGE, COLE,* RODOWSKY, McAULIFFE and CHASANOW, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned.

---

* Cole, J., now retired, participated in the hearing, conference and decision of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the adoption of this opinion.

## ORDER

The Circuit Court for Anne Arundel County, by order of August 30, 1990, declared that the two proposed amendments to the Charter of Anne Arundel County known as the Ballot Initiative amendment and the Property Tax Limitation amendment violated "public general law and are unconstitutional and void under Article XI–A of the Constitution of Maryland." The circuit court's August 30, 1990, order also enjoined the Defendant Board of Supervisors of Elections of Anne Arundel County from placing the two proposed amendments on the ballot to be presented to the voters of Anne Arundel County at the general election to be held on November 6, 1990.

For reasons to be stated in an opinion later to be filed, it is this 20th day of September, 1990,

ORDERED, by the Court of Appeals of Maryland, that the part of the judgment of the Circuit Court for Anne Arundel County relating to the Ballot Initiative amendment is affirmed; and it is further

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the part of the judgment of the Circuit Court for Anne Arundel County relating to the Property Tax Limitation amendment is reversed; and it is further

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the case be remanded to the Circuit Court for Anne Arundel County with directions to declare that certain provisions of the Property Tax Limitation amendment, namely the so-called "rollback" to the 1988–1989 tax year and subparagraph [b], are invalid and severable, and to declare that the Property Tax Limitation amendment is otherwise, facially, not in conflict either with public general law or with Article XI–A of the Constitution of Maryland; and it is further

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the circuit court order that the Defendant Board of Supervisors of Elections

of Anne Arundel County submit to the voters of Anne Arundel County at the general election to be held on November 6, 1990, in accordance with the provisions of Article XI–A of the Constitution of Maryland and Maryland Code (1957, 1986 Repl.Vol.), Article 33, the Property Tax Limitation amendment in the following form:

## "PROPOSED AMENDMENT TO ANNE ARUNDEL COUNTY CHARTER PROPERTY TAX LIMITATION

"Article VII. Budgetary and Fiscal Procedures

"Sec. 710. Reproduction of budget: effective date; tax levy; appropriations [after existing text, add the following new numbered paragraph (d) ]

"[d] Property Tax

(1) Notwithstanding any other provisions of this article, commencing on 1 July 1991 (tax year 1991–92), the County Council may not establish property tax rates which would provide more property tax revenues than were raised during the 1990–91 tax year, except as provided in subparagraph [a] below:

[a] The Constant Yield Tax Rate, as currently specified by the Tax–Property Article of the Annotated Code of Maryland, shall continue as the method of assurance that revenue derived from the property tax remains at a constant level from one year to the next. The provisions of the Tax–Property Article of the Annotated Code of Maryland which permit local taxing authorities to increase property tax rates above the Constant Yield Tax Rate shall be used by the Anne Arundel County Council in the following manner: Commencing 1 July 1991, and applicable to subsequent tax years, the Council may set an annual tax rate which exceeds the Constant Yield Tax Rate by a value which will permit property tax revenues to increase by (1) a percentage corresponding to the immediately previous January Consumer Price Index, U.S. City Average, percentage of change from the preceding January, as computed by the Department of Labor (or

other widely accepted index that measures from time to time the rate of inflation), or (2) by 4.5 percent, whichever is the lesser amount."

Costs to be paid by Anne Arundel County. Appellants' request for attorneys' fees denied. Mandate to issue forthwith.

## ORDER

The Circuit Court for Baltimore County, by order of September 4, 1990, determined that the proposed amendment to the Charter of Baltimore County establishing a limit on property taxes violated Article XI–A of the Constitution of Maryland and certain provisions of the Annotated Code of Maryland. The circuit court ruled that the proposed property tax limitation amendment "cannot remain on the ballot for referendum vote at the general election on November 6, 1990." The circuit court's order also enjoined the defendants, Board of Supervisors of Elections of Baltimore County and State Board of Election Laws, from keeping, after October 5, 1990, the proposed amendment on the ballot to be presented to the voters of Baltimore County at the general election to be held on November 6, 1990.

For reasons to be stated in an opinion later to be filed, the Court of Appeals, a majority of the Court concurring, has determined that certain provisions of the property tax limitation amendment, namely the so-called "rollback" and subparagraph (d)(2), are invalid and severable, and that the property tax limitation amendment is otherwise, facially, not in conflict either with public general law or with Article XI–A of the Constitution of Maryland.

It is this 20th day of September, 1990,

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the injunctive order of the Circuit Court for Baltimore County is reversed; and it is further

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the case be remanded

to the Circuit Court for Baltimore County with directions to order that the defendants, Board of Supervisors of Elections of Baltimore County and State Board of Election Laws, submit to the voters of Baltimore County at the general election to be held on November 6, 1990, in accordance with the provisions of Article XI–A of the Constitution of Maryland and Maryland Code (1957, 1986 Repl.Vol.), Article 33, the proposed amendment in the following form:

## "BALTIMORE COUNTY—PEOPLE'S PETITION TO LIMIT PROPERTY TAXES

*"Purpose of Amendment* To limit the property tax so that property tax revenues will not exceed those revenues realized by the County for the 1990–1991 tax year, except as provided in subparagraph (1) of the Amendment.

*"Proposed Amendment* In accordance with Article XI–A of the Maryland Constitution, Article VII, entitled Budgetary and Fiscal Procedure of the Charter of Baltimore County is hereby amended as follows:

"After Section 710(c), add the following:

"(d) Property Tax. Notwithstanding any other provision of this Charter, commencing on July 1, 1991, and for the tax year 1991–1992, the County property tax may not exceed the property tax realized by the County for the tax year 1990–1991 except as provided in subparagraph (1) herein:

"(1) For the tax year 1991–1992, and for succeeding years the County property tax may be increased, but by no more than 2 percent per year.

"(2) The limitation provided for in subparagraph (d) above shall not apply to property taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.

"(3) If any paragraph, part, clause or phrase hereof is for any reason held to be invalid or unconstitutional, the

remaining portions of the law shall not be affected but will remain in full force and effect."

Costs to be paid by Baltimore County. Mandate to issue forthwith.

## OPINION

ELDRIDGE, Judge.

These cases involve the validity of charter amendments proposed, pursuant to the Maryland Constitution, Art. XI–A, § 5,[1] by petitions of the voters of Baltimore and Anne Arundel Counties respectively. This opinion sets forth the reasons underlying the Court's order requiring each county's Board of Election Supervisors to place proposed "Property Tax Limitation" charter amendments on the ballots for the 1990 general election. Also addressed is this Court's order prohibiting the Anne Arundel County Board of Supervisors of Elections from placing a "Ballot Initiative Amendment" on the ballot.

### I.

As this opinion encompasses two distinct appeals, the facts and procedural history of each case will be addressed separately.

### A.

On July 5, 1990, the Baltimore County Citizens for Representative Government (BCCRG) submitted a petition to place a Property Tax Limitation charter amendment on the

---

1. Section 5 of Art. XI–A provides in relevant part as follows:
 "Section 5. Amendments to charters.
 Amendments to any charter adopted by the City of Baltimore or by any County of this State under the provisions of this Article may be proposed by a resolution of the Mayor of Baltimore and the City Council of the City of Baltimore, or the Council of the County, or by a petition signed by not less than 20% of the registered voters of the City or County, provided, however, that in any case 10,000 signatures shall be sufficient to complete a petition. * * *."

1990 general election ballot.[2] The Board of Election Supervisors reviewed the petition and found that it contained the requisite number of signatures.[3] The proposed charter amendment would have altered § 710 of the Baltimore County charter. Section 710 of the charter provides that when the county budget has been finally adopted, the county council shall levy and raise the amount of taxes required by the budget. The proposed amendment would have required the property tax revenues for the tax year 1991–1992 to be limited to the amount of property tax revenues realized for the tax year 1989–1990; it would not have allowed the tax revenues to be raised by more than 2% per year, beginning with tax year 1992–1993. An "escape clause" would have permitted the county council to increase property taxes by more than the 2% maximum when at least two-thirds of the qualified registered voters in the county approved the increase by referendum. The proposed amendment to § 710 of the Baltimore County charter also

---

**2.** The petition proposed that the following language be added to § 710 of the Baltimore County Charter:

"(d) Property Tax. Notwithstanding any other provision of this Charter, commencing on July 1, 1991, and for the tax year 1991–1992, the County property tax may not exceed the property tax realized by the County for the tax year 1989–1990, except as provided in subparagraph (1) and (2) herein:

(1) For the tax year 1992–1993, and for succeeding years the County property tax may be increased, but by no more than 2 percent per year.

(2) In any tax year subsequent to tax year 1991–1992, the county may increase the property taxes by no more than 2 percent provided such increase is put to referendum by the County and is approved by not less than two thirds of the qualified registered voters in the County.

(3) The limitation provided for in subparagraph (d) above shall not apply to property taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.

(4) If any paragraph, part, clause or phrase hereof is for any reason held to be invalid or unconstitutional, the remaining portions of the law shall not be affected but will remain in full force and effect."

**3.** The requisite number of signatures required 20% of the registered voters of the County, or 10,000, whichever is less. *See* note 1, *supra.*

contained a severability provision in the event that any portion of the proposed amendment were found to be invalid.

On August 16, 1990, Baltimore County and nine individual taxpayers filed a complaint in the Circuit Court for Baltimore County. The plaintiffs sought a declaration that the proposed amendment to the charter of Baltimore County was void because it violated Art. XI–A of the Maryland Constitution and/or because it conflicted with Maryland Code (1986), § 6–302(a) and § 6–308 of the Tax–Property Article. The plaintiffs also requested an injunction prohibiting the placement of the amendment on the general election ballot.

On August 31, 1990, the circuit court declared that the proposed amendment violated both the Maryland Constitution and the Tax–Property Article of the Maryland Code and therefore could not be on the ballot. Nevertheless, the court directed the Board of Supervisors of Elections of Baltimore County not to remove the proposed tax limitation amendment from the ballot until the earlier of October 5, 1990,[4] or a decision as to the validity of the amendment by this Court. On the same day, the BCCRG noted an appeal to the Court of Special Appeals. Prior to any proceedings in the Court of Special Appeals, Baltimore County filed in this Court a petition for writ of certiorari which we granted on September 6, 1990.

### B.

The facts and procedural history surrounding the Anne Arundel County case are similar. On July 20, 1990, the Anne Arundel Taxpayers for Responsive Government (AATRG) submitted petitions to place a Property Tax Limi-

---

**4.** October 5, 1990, was the latest date by which the Board of Supervisors of Elections must have been informed of all items which would be placed on the November 6, 1990, election ballot.

tation charter amendment[5] and a Ballot Initiative charter amendment on the 1990 general election ballot.

Section 710 of the Anne Arundel County charter requires the County Council to maintain a balanced budget. The section also exempts from executive veto any ordinance that levies taxes required to balance the budget. The proposed amendment to § 710 of the Anne Arundel County charter would have limited property tax revenues for the tax year 1991–1992 to the amount of property revenues raised during the 1988–1989 tax year. The proposal would have placed the tax cap provision of the amendment in the context of the constant yield tax rate provided for in the Tax–Property Article of the Annotated Code of Maryland. Specifically, beginning with tax year 1992–1993, the Anne

---

5. The petition proposed that the following language be added to § 710 of the Anne Arundel County Charter:

"[d] Property Tax

"(1) Notwithstanding any other provision of this article, commencing on 1 July 1991 (tax year 1991–1992), the County Council may not establish property tax rates which would provide more property tax revenues than were raised during the 1988–1989 tax year, except as provided in subparagraphs [a] and [b] below:

"[a] The Constant Yield Tax Rate, as currently specified by the Tax–Property Article of the Annotated Code of Maryland, shall continue as the method of assurance that revenue derived from the property tax remains at a constant level from one year to the next. The provisions of the Tax–Property Article of the Annotated Code of Maryland which permit local taxing authorities to increase property tax rates above the Constant Yield Tax Rate shall be used by the Anne Arundel County Council in the following manner: Commencing 1 July 1992, and applicable to subsequent tax years, the Council may set an annual tax rate which exceeds the Constant Yield Tax Rate by a value which will permit property tax revenues to increase by (1) a percentage corresponding to the immediately previous January Consumer Price Index, U.S. City Average, percentage of change from the preceding January, as computed by the Department of Labor (or other widely accepted index that measures from time to time the rate of inflation), or (2) by 4.5 percent, whichever is the lesser amount.

"[b] In any tax year subsequent to 1992, the County Council may increase property tax revenues for that year by an amount greater than that stated in paragraph (d) herein by referring a specific revenue increase to a referendum of the qualified voters of the County."

Arundel County Council could not have allowed property tax revenues to exceed the constant yield rate by a value greater than the increase in the Consumer Price Index from the preceding January, or by 4.5%, whichever would be less. The proposed Anne Arundel County amendment also contained an "escape clause" that would have allowed the county council to exceed the cap upon approval by the qualified voters of the county in a referendum.

The second Anne Arundel County proposed charter amendment would have amended § 308 of the county charter. Section 308 reserves to the voters of Anne Arundel County the right of referendum regarding legislation passed by the county council. The proposed amendment would have given the voters of Anne Arundel County the power to initiate legislation which would not be subject to the veto power of the County Executive, and which could only be amended or repealed by an affirmative vote of all seven members of the county council.[6]

On August 6, 1990, four individual taxpayers and Anne Arundel County filed in the Circuit Court for Anne Arundel County a complaint and motion for summary judgment. The plaintiffs sought injunctive and declaratory relief, alleging that both of the proposed amendments were invalid because they violated the Maryland Constitution. The plaintiffs further contended that the Property Tax Limitation amendment was in conflict with §§ 6–302(a) and 6–308 of the Tax–Property Article of the Maryland Code.

On August 30, 1990, the Circuit Court for Anne Arundel County declared that both proposed amendments were un-

---

**6.** Initiative refers to the process by which the electorate petitions for and votes on a proposed law. Referendum is the process by which legislation passed by the governing body is submitted to the electorate for approval or disapproval. O.M. Reynolds, Jr., *Handbook of Local Government Law,* §§ 203, 204 (1982). *See also Cheeks v. Cedlair Corp.,* 287 Md. 595, 613 n. 9, 415 A.2d 255, 264 n. 9 (1980) (defining initiative); *Ritchmount Partnership v. Board,* 283 Md. 48, 60, 388 A.2d 523, 531 (1978) (defining referendum). *See generally Bd. of Election Laws v. Talbot County,* 316 Md. 332, 347–351, 558 A.2d 724, 731–733 (1989).

constitutional. The court entered an injunction prohibiting the Board of Supervisors of Elections of Anne Arundel County from placing either proposed amendment on the 1990 general election ballot. The same day, AATRG filed a notice of appeal to the Court of Special Appeals. Before any proceedings in the Court of Special Appeals, Anne Arundel County and the individual taxpayers filed a petition for a writ of certiorari which was granted by this Court on September 6, 1990.

## C.

■ The oral arguments for the Baltimore County and Anne Arundel County appeals were advanced to September 19, 1990. On appeal, the parties addressed the standing of the plaintiffs, the constitutionality of the charter amendments, the potential conflict of the charter amendments with public general law, and the possibility of severing any portions found to be invalid.[7]

---

7. The defendants in both cases contested the standing of Baltimore County and Anne Arundel County to challenge the validity of the proposed charter amendments. As previously stated, however, individual taxpayers in each county also contested the proposed amendments' validity. Individual taxpayers have standing to sue for an injunction against submitting a proposal to the electorate; otherwise, they would be "put to wrongful expense for the publication of the referendum and the printing of it on the ballots of the next general election." *Sun Cab Company v. Cloud*, 162 Md. 419, 422, 159 A. 922, 923 (1932). *See also Bd. of Election Laws v. Talbot County, supra*, 316 Md. at 341–342, 558 A.2d at 728–729; *State v. Burning Tree Club, Inc.*, 315 Md. 254, 292, 554 A.2d 366, 385, *cert. denied*, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); *Inlet Associates v. Assateague House*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988); *Citizens P. & H. Ass'n v. County Exec.*, 273 Md. 333, 338–343, 329 A.2d 681, 684–687 (1974).

It is a long established rule that "[w]here there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing." *Board v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990). *See also Sugarloaf v. Waste Disposal*, 323 Md. 641, 650 n. 6, 594 A.2d 1115, 1119 n. 6 (1991); *State v. Burning Tree Club, Inc.*, *supra*, 315 Md. at 291, 554 A.2d at 385; *Montgomery County v. Board of Elections*, 311 Md. 512, 516 n. 3, 536 A.2d 641, 643 n. 3 (1988); *State's Atty v. City of Balto.*, 274 Md. 597, 602, 337 A.2d 92, 96 (1975), and cases there cited.

At the conclusion of oral arguments, we affirmed the portion of the judgment of the Circuit Court for Anne Arundel County which prohibited the Board of Election Supervisors of Anne Arundel County from placing the proposed Ballot Initiative amendment on the ballot. Otherwise, we reversed the judgments of the circuit courts and required the Boards of Supervisors of Elections of Baltimore County and Anne Arundel County to place the respective proposed Property Tax Limitation charter amendments, with certain invalid portions severed, on the 1990 general election ballot.[8]

## II.

■ The proposed Anne Arundel County Ballot Initiative charter amendment attempted to reserve to the voters of that county "the power to propose public local laws in the same manner as provided for the County Council ... and to adopt or reject the same, at the [next county-wide election]." The effect of the proposed amendment would have been to allow voter-initiated legislation in Anne Arundel County. Anne Arundel County and the individual plaintiffs argued that the amendment violated Art. XI–A, § 3, of the Maryland Constitution, and thus was invalid.[9]

---

8. We note that both of the proposed Property Tax Limitation charter amendments were rejected by the voters of Anne Arundel and Baltimore Counties at the November 1990 general election.

9. Art. XI–A, § 3, of the Maryland Constitution provides in relevant part as follows:
 "**Section 3. Legislative bodies; chief executive officers; enactment, publication and interpretation of local laws.**
 "Every charter so formed shall provide for an elective legislative body in which shall be vested the law-making power of said City or County. Such legislative body in the City of Baltimore shall be known as the City Council of the City of Baltimore, and in any county shall be known as the County Council of the County. The chief executive officer, if any such charter shall provide for the election of such executive officer, or the presiding officer of said legislative body, if such charter shall not provide for the election of a chief executive officer, shall be known in the City of Baltimore as Mayor of Baltimore, and in any County as the President or Chair-

In *Bd. of Election Laws v. Talbot County*, 316 Md. 332, 348–350, 558 A.2d 724, 732–733 (1989), this Court flatly held that § 216 of the Talbot County charter, authorizing voter-initiated legislation, was "manifestly repugnant" to Art. XI–A, § 3, of the Maryland Constitution. Quoting from the opinion in *Cheeks v. Cedlair Corp.*, 287 Md. 595, 613, 415 A.2d 255, 264 (1980), we stated (316 Md. at 349, 558 A.2d at 732):

 " 'The powers of referendum and initiative, though each may affect the form or structure of local government, are otherwise distinctly different. Under the referendum power, the elective legislative body, consistent with § 3, continues to be the primary legislative organ, for it has formulated and approved the legislative enactment referred to the people. The exercise of the legislative initiative power, however, completely circumvents the legislative body, thereby totally undermining its status as the primary legislative organ.' Thus, we held that 'the power to initiate legislation, unlike the referendum power, cannot be reconciled with § 3.' "

man of the County Council of the County, and all references in the Constitution and laws of this State to the Mayor of Baltimore and City Council of the City of Baltimore or to the County Commissioners of the Counties, shall be construed to refer to the Mayor of Baltimore and City Council of the City of Baltimore and to the President or Chairman and County Council herein provided for whenever such construction would be reasonable. From and after the adoption of a charter by the City of Baltimore, or any County of this State, as hereinbefore provided, the Mayor of Baltimore and City Council of the City of Baltimore or the County Council of said County, subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws of said City or County including the power to repeal or amend local laws of said City or County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided; provided that nothing herein contained shall be construed to authorize or empower the County Council of any County in this State to enact laws or regulations for any incorporated town, village, or municipality in said County, on any matter covered by the powers granted to said town, village, or municipality by the Act incorporating it, or any subsequent Act or Acts amendatory thereto. * * * "

*Talbot County* is precisely on point, and is determinative of the ballot initiative issue here. *See also Griffith v. Wakefield,* 298 Md. 381, 470 A.2d 345 (1984); *Ritchmount Partnership v. Board,* 283 Md. 48, 388 A.2d 523 (1978); *Rowe v. Chesapeake & Potomac Tel. Co.,* 56 Md.App. 23, 466 A.2d 538 (1983).

We reiterate that the voters of a charter county cannot reserve to themselves the power to initiate legislation because such initiative conflicts with the terms of Art. XI–A, § 3, of the Maryland Constitution. Therefore, the proposed Ballot Initiative amendment was unconstitutional, and the injunction prohibiting the Board of Election Supervisors of Anne Arundel County from placing it on the general election ballot was proper.

### III.

The proposed Property Tax Limitation charter amendments in Baltimore and Anne Arundel Counties would have placed a percentage cap on the amount of local property tax revenues to be raised each year. The plaintiffs in both cases attacked the proposed Property Tax Limitation amendments on two grounds. First, they asserted that a limitation on the taxing power of the county councils is not proper charter material, and thus is repugnant to Art. XI–A of the Maryland Constitution. Relying on *Griffith v. Wakefield, supra,* 298 Md. at 385, 388, 470 A.2d at 348–349, and *Cheeks v. Cedlair Corp., supra,* 287 Md. at 606–607, 415 A.2d at 261, the plaintiffs argued that a charter is intended to establish "the form and structure of government" and that the proposed amendments would not have changed "the form and structure" of the counties' governments. Second, the plaintiffs claimed that the proposed tax limitation amendments conflicted with public general law, namely §§ 6–302(a) and 6–308 of the Tax–Property Article of the Maryland Code.

### A.

The tax cap portion of the proposed tax limitation amendments constituted proper charter material. We have

repeatedly explained that a county charter is equivalent to a constitution. *Bd. of Elections Laws v. Talbot County, supra,* 316 Md. at 341, 558 A.2d at 728; *County Exec., Prince Geo's Co. v. Doe,* 291 Md. 676, 680, 436 A.2d 459, 461 (1981); *Cheeks v. Cedlair Corp., supra,* 287 Md. at 606, 415 A.2d at 261; *Ritchmount Partnership v. Board, supra,* 283 Md. at 58, 388 A.2d at 530; *Harford County v. Schultz,* 280 Md. 77, 85, 371 A.2d 428, 432 (1977); *Anne Arundel County v. Moushabek,* 269 Md. 419, 422, 306 A.2d 517, 519 (1973). The basic function of a constitution or a charter is to distribute power among the various agencies of government, and between the government and the people who have delegated that power to their government. As Chief Judge Murphy stated for the Court in *Cheeks v. Cedlair Corp., supra,* 287 Md. at 607, 415 A.2d at 261:

> "A charter ... is the organic, the fundamental law, establishing basic principles governing relationships between the government and the people."

The proposed Property Tax Limitation amendments directly involved the relationship between the people and the government by limiting the power of the government to tax.

Limitations imposed by the people on their government are fundamental elements of a constitution. *See, e.g., Marbury v. Madison,* 1 Cranch 137, 176–177, 2 L.Ed. 60, 73 (1803); *The Federalist,* Nos. 78, 81, 84 (1788) (Alexander Hamilton).[10] The Maryland Declaration of Rights and the

---

**10.** Thus, even those who are particularly known for having favored broad constructions of the federal constitution have recognized that an essential—perhaps the essential—function of a constitution is to limit government power.

In *Marbury v. Madison, supra,* 1 Cranch at 176, 2 L.Ed. at 73, Chief Justice John Marshall, after pointing out that the government of the United States is one with "certain limits not to be transcended," went on to say: "that those limits may not be mistaken, or forgotten, the constitution is written." Later the Chief Justice emphatically stated that if constitutional limitations on legislative power are not enforceable, "then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable." 1 Cranch at 177, 2 L.Ed. at 73.

Bill of Rights to the United States Constitution largely represent limitations on governmental power. In fact, the desire of the people to limit the government's ability to tax was a major cause of the American Revolution. "There was no colony of English America, in which the claim of the inhabitants, to exemption from all taxation not sanctioned by their assent, was more familiar than in Maryland." [11] The Constitution of the United States,[12] the Constitution of Maryland,[13] and the charters of Anne Arundel and Baltimore counties,[14] are replete with provisions limiting the power of governments to raise and appropriate revenue. Thus, a limitation on the power of a legislative body to raise revenue is at the heart of the form and structure of our government and thus is proper charter material. *See Bd. of Election Laws v. Talbot County, supra,* 316 Md. at 347–348, 558 A.2d at 731–732; *Griffith v. Wakefield, supra,* 298 Md. at 389, 470 A.2d at 350; *Cheeks v. Cedlair Corp., supra,* 287 Md. at 606–608, 415 A.2d at 261–262; *Ritchmount Partnership v. Board, supra,* 283 Md. at 58, 388 A.2d at 530.

Neither *Griffith v. Wakefield, supra,* nor *Cheeks v. Cedlair Corp., supra,* upon which the plaintiffs rely, are to the contrary. As Judge Rodowsky noted in his dissent in

---

In No. 84 of *The Federalist,* Alexander Hamilton argued extensively that the federal constitution, by only delegating certain powers to the federal government, represented essentially a limitation upon governmental powers. He stated "that the constitution is itself, in every rational sense, and to every useful purpose, *a bill of rights.*" (Emphasis in original).

**11.** J. McMahon, *Historical View of the Government of Maryland,* 326 (1831).

**12.** Article I, § 7, cl. 1; Article I, § 8, cl. 1; Article I, § 9, cls. 1, 4, 5, 6; Article I, § 10, cls. 2, 3.

**13.** Declaration of Rights: Articles 14, 15; Constitution: Article II, § 17; Article III, §§ 32, 34, 51, 52, 54; Article VIII, § 3; Article XI, § 7; Article XI–E, § 5; Article XI–F, §§ 8, 9.

**14.** Anne Arundel County Charter, §§ 608, 704, 709, 710, 718 and 719; Baltimore County Charter, §§ 704, 709, 710, 716 and 717.

*Griffith v. Wakefield, supra,* 298 Md. at 390–391, 470 A.2d at 350–351, "the majority opinion does not conflict" with the conclusion that taking fiscal power away from the county council is "bedrock charter material" that "alters the form and structure of government ... in a most fundamental way." Instead both *Griffith v. Wakefield* and *Cheeks v. Cedlair Corp.* were concerned with attempts by the voters to initiate detailed legislation through the guise of charter amendments.

In *Cheeks v. Cedlair Corp.,* this Court invalidated a proposed amendment to the Baltimore City charter which would have created a tenant-landlord commission and would have imposed a comprehensive system of rent control. We held that the proposed amendment was an attempt to "divest the [City] Council of its acknowledged ... power to legislate on the subject of rent control." 287 Md. at 609, 415 A.2d at 262. Thus, the proposed amendment was essentially legislative in nature and not valid charter material.

The proposed charter amendment in *Griffith v. Wakefield* sought to create a system of binding arbitration for Baltimore County and the fire fighters' union. The proposal set forth in detail the entire system of arbitration and left "nothing for the determination of the County Executive or the County Council." 298 Md. at 386, 470 A.2d at 348. The Court held that the amendment was invalid because it was " 'essentially legislative in character;' [and] it [was] a complete and specifically detailed legislative scheme." 298 Md. at 388, 470 A.2d at 349. In distinguishing *Maryland Cl. Emp. Ass'n v. Anderson,* 281 Md. 496, 380 A.2d 1032 (1977), the Court stated (298 Md. at 389, 470 A.2d at 350):

> "It is common for constitutions or charters to authorize, or preclude, specified types of enactments by legislative bodies. This is quite different from a charter itself containing all of the detailed provisions concerning the subject."

*See also Harford County v. Board,* 272 Md. 33, 39, 321 A.2d 151, 154 (1974) ("It is not uncommon for people to

write into their basic charter a restriction upon the powers of their legislative body"); *Bell v. Arel,* 123 N.H. 311, 316, 461 A.2d 108, 110–111 (1983) (citizens may require limits on taxation as long as no impairment of the city's ability to carry out its mandatory obligations will occur); E. McQuillin, *The Law of Municipal Corporations,* § 44.26 (3rd ed. 1984) ("A common express restriction upon the municipal power to tax is one limiting the amount or the rate that may be imposed in any one year. The validity of such a provision generally is sustained").

The proposed Property Tax Limitation amendments at issue here did not suffer from the same weakness as was presented by the proposed amendments in *Cheeks* and *Griffith.* These proposed tax limitation amendments were not back-door attempts by the voters of Baltimore and Anne Arundel Counties to enact detailed legislation. Nor did they divest the county councils of the ability to set the property tax rates. Rather, each would have merely precluded a particular type of enactment by the legislative body, namely the power to collect property taxes above the specified cap.

There are also practical difficulties with the plaintiffs' position that the proposed Property Tax Limitation amendments would have impermissibly infringed on the legislative power conferred on the county councils by Art. XI–A and thus were not proper charter material. Acceptance of the plaintiffs' arguments that limits cannot be placed on the budgetary and fiscal authority of county councils would result in the invalidation of many existing provisions in county charters which, as previously noted, limit the power of the county councils in these areas. For example, the executive budget system, in effect in several counties, places a greater restriction on the fiscal power of the county councils than these proposed Property Tax Limitation amendments would have. Under the executive budget system, the county executive prepares and submits a budget for each fiscal year. *See* Baltimore County Charter, § 706; Anne Arundel County Charter, § 706. The county

council has "no power to change the form of the budget as submitted by the county executive, to alter the revenue estimates except to correct mathematical errors, or to increase any expenditure recommended by the county executive for current or capital purposes." Baltimore County Charter, § 709; Anne Arundel County Charter, § 709. Various other limitations on the fiscal powers of the two county councils are contained in their charters. *See* note 14, *supra*.

■ Consequently, we hold that a provision in a county charter placing restrictions upon the county council's revenue raising authority is a fundamental aspect of the form and structure of government and thus is proper charter material.

### B.

■ The proposed Property Tax Limitation amendments also were challenged on the ground that they conflicted with public general law, Code, §§ 6–302(a) and 6–308 of the Tax–Property Article.[15]

---

**15.** Section 6–302(a) provides:

"(a) *In general.*—Except as otherwise provided in this section and after complying with § 6–305 of this subtitle, in each year after the date of finality and before the following July 1, the Mayor and City Council of Baltimore City or the governing body of each county annually shall set the tax rate for the next taxable year on all assessments of property subject to that county's property tax."

Section 6–308 provides in relevant part as follows:

"§ 6–308. Constant yield tax rate.

"(b) *In general.*—(1) Unless the requirements of this section are met, a taxing authority may not set a county or municipal corporation property tax rate that exceeds the constant yield tax rate in any taxable year excluding revenue from property appearing for the first time on the assessment roll. . . .

"(c) *Notice of rate change.*—If a taxing authority intends to set a county or municipal corporation property tax rate that exceeds the constant yield tax rate, it shall advertise to the public. . . .

\* \* \* \* \* \*

"(e) *Contents of notice.*—The notice shall state:

We have on numerous occasions pointed out that "[w]hen a provision in a county charter conflicts with a public general law, the public general law prevails under Art. XI–A, § 1." *Rosecroft Trotting & Pacing v. P.G. County*, 298 Md. 580, 599, 471 A.2d 719, 729 (1984). *See also Montgomery County v. Board of Elections*, 311 Md. 512, 514, 536 A.2d 641, 642 (1988); *East v. Gilchrist*, 296 Md. 368, 374, 463 A.2d 285, 288 (1983); *Wilson v. Bd. of Sup. of Elections*, 273 Md. 296, 301, 328 A.2d 305, 308 (1974); *Schneider v. Lansdale*, 191 Md. 317, 61 A.2d 671 (1948). Nevertheless, "[w]herever reasonably possible, courts will construe enactments so that there is no conflict. This principle avoids the need to invalidate one law or the other." *Town of Forest Heights v. Frank*, 291 Md. 331, 337, 435 A.2d 425, 428 (1981); *Wilson v. Bd. of Sup. of Elections, supra*, 273 Md. at 301, 328 A.2d at 308.

Section 6–302(a) of the Tax–Property Article provides that the government body of a county shall set the tax rate on property for the next taxable year. The proposed tax limitation amendments would not have conflicted with this provision. If the proposed amendments had been adopted, the county councils of Baltimore and Anne Arundel Counties could still have exercised discretion to determine the tax rates on property for the next taxable year. A limitation would simply have been placed on this power, so that the increase in property tax revenue for the next tax year could not have exceeded 2% in Baltimore County or 4.5% in Anne Arundel County. The proposed tax limitations would not have had the effect of allowing the electorate of the two counties to set the tax rates. As required by § 6–302(a), the legislative body in each county would continue to set the

(1) that the meeting is being held to hear comments regarding an increase in the county or municipal corporation property tax rate that will make the rate exceed the consent [sic] yield tax rate; and
(2) the day, time, and location of the meeting.

\* \* \* \* \* \*

"(g) *Adoption of tax rate.*—After the meeting, the taxing authority may adopt by law an increase in the county or municipal corporation property tax rate that exceeds the constant yield tax rate...."

tax rate on property. There is no language in the statute indicating that reasonable limits cannot be placed on the legislative power to set the tax rate.

■ Nor do we agree with the plaintiffs' argument that the proposed Property Tax Limitation amendments conflicted with § 6–308 of the Tax–Property Article. Both Baltimore and Anne Arundel Counties contended that § 6–308(g) constitutes an affirmative grant of power authorizing the county councils to adopt an increase in the property tax rate which exceeds the constant yield rate. We have previously held, however, that § 6–308(g) represents a *limitation* on the taxing power of a county. *Garrett County v. Bolden,* 287 Md. 440, 446–447, 413 A.2d 190, 193 (1980). We stated that the purpose of § 6–308 "is to focus public attention from one year to the next on the interrelationship between the rate of property tax and the assessable basis in a period of rising property values." *Ibid.* Contrary to the plaintiffs' interpretation, § 6–308 specifies detailed procedural requirements with which a county governing body must comply before it will be permitted to increase the tax rate above the constant yield rate. The proposed tax limitation amendments would have also limited the power of the county councils to raise the tax rate above the constant yield rate. Since § 6–308 is a procedural provision limiting a county's authority, rather than an affirmative grant of power, it does not conflict with the proposed Property Tax Limitation amendments.

## C.

■ We hold that the tax cap portions of the proposed Property Tax Limitation amendments were facially valid because they constituted proper charter material and did not conflict with public general law. Nevertheless, we render no opinion as to the validity of the tax caps as they might have been applied in practice. County governments are required by state law to provide many public services such as public education, police and fire protection services,

water and sewage services, etc. If it is subsequently demonstrated in a particular case that a local limitation on property tax revenues so hampers a county government that it cannot perform the duties required under state law, a tax limitation charter provision may well be found to be invalid as applied. *See* E. McQuillin, *The Law of Municipal Corporations, supra,* at § 44.26.

## IV.

While the tax cap portion of the proposed Property Tax Limitation amendments were valid, there were two aspects of the amendments that were inconsistent with public general law and thus were invalid. Those portions of the amendments, however, were severable.

## A.

■ The "roll back" provisions of the proposed amendments would have limited the amount of property tax revenues for the tax year 1991–1992 to no more than the amount collected in the tax year 1989–1990 for Baltimore County, and no more than that collected in the tax year 1988–1989 for Anne Arundel County. These provisions violated § 6–302(a) of the Tax–Property Article which mandates that the governing body of each county is to set the property tax rate for the next tax year. Unlike the tax cap provisions that would have simply placed a limit on the taxing power of each county council, the roll back provisions would have transferred the county councils' § 6–302(a) powers to the voters. Instead of the councils setting the tax rates, the roll back provisions would have allowed the voters of Baltimore and Anne Arundel Counties to set the property tax rates for the tax year 1991–1992.

■ In addition, each county's proposed amendment included an escape clause that would have allowed the county councils to increase the property tax rates in any given tax year above the rate specified in the tax cap by referring the proposed increase to the voters for approval. The escape

clause provisions were invalid for the same reason that the roll back provisions were invalid. Section 6–302(a) of the Tax–Property Article requires that a county's tax rate be set by the governing body of the county. The effect of the escape clause provisions would have been that, even if a county council would determine in any given year that it is necessary to raise the tax rate above the limit specified by the cap, the voters of the county would have decided whether the rate would be raised to particular levels above the caps or would remain at cap levels. Thus, in essence, the voters would be setting the tax rate for that year.

In light of our conclusion that the escape clause provisions violated public general law, we need not deal with other issues that were raised concerning the validity of the escape clauses.

## B.

■■■ Both the invalid roll back and the invalid escape clause provisions were severable from the valid portions of the proposed Property Tax Limitation amendments. There is a strong presumption that if a portion of an enactment is found to be invalid, the intent is that such portion be severed. *Sugarloaf Citizens Assoc. v. Gudis,* 319 Md. 558, 574, 573 A.2d 1325, 1333 (1990); *Porten Sullivan Corp. v. State,* 318 Md. 387, 410, 568 A.2d 1111, 1122 (1990); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 297, 554 A.2d 366, 387 (1989); *O.C. Taxpayers v. Ocean City,* 280 Md. 585, 600, 375 A.2d 541, 550 (1977). This presumption has never been limited solely to bills enacted by the General Assembly, but has been applied to local ordinances, *Anne Arundel County v. Moushabek, supra,* 269 Md. at 430, 306 A.2d at 523, charter amendments, *O.C. Taxpayers v. Ocean City, supra,* 280 Md. at 601–603, 375 A.2d at 550–551, and provisions of the state constitution invalidated under the federal constitution, *Davidson v. Miller,* 276 Md. 54, 83, 344 A.2d 422, 439 (1975). This presumption applies even in the absence of an express clause declaring the drafters' intent that the enactment be severed if a portion is found to be

invalid. *Cities Service Co. v. Governor*, 290 Md. 553, 575, 431 A.2d 663, 676 (1981); *O.C. Taxpayers v. Ocean City, supra*, 280 Md. at 600, 375 A.2d at 550. Inclusion of a severability clause, like the clause inserted in the proposed charter amendment in Baltimore County, reinforces the presumption. *Cities Service Co. v. Governor, supra*, 290 Md. at 576, 431 A.2d at 676; *O.C. Taxpayers v. Ocean City, supra*, 280 Md. at 601, 375 A.2d at 550.

In addition to this general presumption, it is a settled principle that "[w]hen the dominant purpose of an enactment may largely be carried out notwithstanding the [enactment's] partial invalidity, courts will generally hold the valid portions severable and enforce them." *O.C. Taxpayers v. Ocean City, supra*, 280 Md. at 601, 375 A.2d at 550. *See also State v. Burning Tree Club, Inc., supra*, 315 Md. at 297, 554 A.2d at 387–388; *Cities Service Co. v. Governor, supra*, 290 Md. at 576, 431 A.2d at 676.

 The dominant purpose of the proposed Property Tax Limitation amendments was to place a cap on property tax revenues. We have upheld the facial validity of these tax cap provisions. The purpose of the tax cap could have been carried out without the invalid roll back or escape clause provisions. Thus, under the principles set forth in the above-cited cases, we had a duty to sever the invalid provisions and allow the tax cap provisions to be submitted to the electorate at the November 1990 general election.[16]

 Despite these well established principles of severability, the plaintiffs argued that any invalid provisions should not be severed and that if any portion of the pro-

---

**16.** We wish to point out that the Court did not rewrite, to suit itself, the proposed amendments in our Order of September 20, 1990. Instead, applying the principles set forth in the above-cited cases, we simply deleted the portions of the amendments which we found to be invalid. This necessitated changing some of the dates specified in the proposed amendments in order to eliminate the invalid roll back provisions. *But cf. The Sun*, October 9, 1990, editorial, p. 6A ("The Court of Appeals ... took the unprecedented step of rewriting the referendum questions to suit the court's fancy.")

posed amendment was invalid, the entire amendment should not be submitted to the electorate. In essence their argument was that severability principles did not apply to a proposed charter amendment. The severability principles discussed above are a fundamental part of the determination of validity. This court has "consistently taken the position that the submission to the voters of a proposed charter amendment, in conflict with public general law, should be enjoined." *Montgomery County v. Board of Elections, supra,* 311 Md. at 518, 536 A.2d at 644; *Wilson v. Bd. of Sup. of Elections, supra,* 273 Md. at 300, 328 A.2d at 308; *Planning Commission v. Randall,* 209 Md. 18, 23–24, 120 A.2d 195, 198 (1956); *Schneider v. Lansdale, supra,* 191 Md. at 322, 61 A.2d at 673. Similarly, if a portion of a proposed charter amendment is invalid and severable, this Court has a duty to sever those portions when they are challenged. *See O.C. Taxpayers v. Ocean City, supra,* 280 Md. at 600, 375 A.2d at 550; *Shell Oil Co. v. Supervisor,* 276 Md. 36, 48, 343 A.2d 521, 528 (1975); *Bringe v. Collins,* 274 Md. 338, 351, 335 A.2d 670, 678 (1975).

This Court in *Schneider v. Lansdale, supra,* was confronted with the issue of whether portions of the proposed Montgomery County Charter conflicted with the Maryland Constitution. The Court held that the challenged portions of the Charter under consideration were valid and, therefore, did not need to reach the issue of whether and when to sever portions found to be invalid. The Court, however, did infer that this determination would be based upon whether any invalid portion was "so inseparable from the remainder that its invalidity makes the whole invalid." *Schneider v. Lansdale, supra,* 191 Md. at 323, 61 A.2d at 673.

Other language in *Schneider* arguably supports the idea that even if portions of a proposed charter amendment are invalid and capable of being severed, they should not be severed until after the election. Such language in *Schneider* was dicta. Moreover, to the extent that it could be interpreted to allow voters to vote on invalid portions of a charter amendment, it is inconsistent with subsequent deci-

sions of this Court and is erroneous. *See, e.g., Montgomery County v. Board of Elections, supra,* 311 Md. at 520, 536 A.2d at 645 ("Allowing a vote on proposed charter amendments which, if approved by the electorate, cannot go into effect because they conflict with higher law, would be to sanction 'straw votes' on a multitude of public issues or potential issues"). Furthermore, submission of an amendment with invalid and severable portions intact would mislead the public during the election by asking them to vote on an amendment which, in its present form, was incapable of becoming part of their charter. We do not believe that it is appropriate to deceive the voters in this fashion.

We have determined in this case that severance of the invalid portions does not destroy the dominant purpose of the amendments and that they were not "so inseparable from the remainder that [their] invalidity makes the whole invalid." *Schneider,* 191 Md. at 323, 61 A.2d at 673. Thus, the invalid roll back provisions and the invalid escape clause provisions of the Property Tax Limitation amendments were severed. The tax cap provisions were properly submitted to the voters of Baltimore and Anne Arundel Counties at the November 6, 1990, general election.

MURPHY, Chief Judge, dissenting:

While I am in full accord with Part II of the Court's opinion, I disagree with the holding in Part III that the proposed "property tax limitations" charter amendments constitute a fundamental aspect of the "form and structure of government" and are, therefore, proper charter material. I share the view of the two circuit courts below, each of which held that the proposed amendments violated Art. XI–A of the Maryland Constitution. I, therefore, respectfully dissent from the Court's determination that the proposed charter amendments were valid and were properly submitted to the voters at the 1990 general election.

Art. XI–A, § 2 of the Maryland Constitution requires the General Assembly, by public general law, to provide a grant of express powers to counties which adopt a charter form of

government. Pursuant to this constitutional provision, the Express Powers Act, Maryland Code (1990 Repl.Vol.), Art. 25A, § 5, was enacted and enumerated the express powers granted to the charter counties. Under § 3 of Art. XI–A, a county charter must provide for an elective legislative body, to be known as the county council; vested in it by this section is "full power to enact local laws" for the county upon all matters covered by the express powers granted under Art. 25A. Section 5(O) of Art. 25A authorizes the county council to assess, levy, and collect taxes through the enactment of local laws "as may be necessary for the support and maintenance of the county government."

Section 5 of Art. XI–A permits voter-initiated petitions to amend a county charter which, if adopted, become part of the charter. It is clear from our cases that a charter amendment authorized by this section "is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter." *Cheeks v. Cedlair Corp.*, 287 Md. 595, 607, 415 A.2d 255 (1980). A charter amendment, therefore, "differs in its fundamental character from a simple legislative enactment"; its content, we have said, "cannot transcend its limited office and be made to serve or function as a vehicle through which to adopt local legislation." *Id.* Thus, under § 3 of Art. XI–A, the elected county council, and not the electorate, is given the power to enact local laws upon "all matters covered by the express powers granted" to the county in Art. 25A. Consequently, the voters cannot by charter amendment divest the county council of its granted power to make laws governing the imposition of taxes by placing a property tax limitation in the county charter. As we said in *Cheeks*, 287 Md. at 610, 415 A.2d 255, "to allow the voters, through the charter initiative, rather than the legislative process, to exercise the full range of the [county's] express powers would plainly involve an excessive exercise of those precisely limited powers granted to the [county], and specifically to the [county council] in its representative capacity." The exercise of the charter initiative

power to limit the amount of taxes that may be collected to support the county government preempts the county council's law-making power in its determination of the tax imposition necessary to maintain and operate the county government.

A charter form of government establishes the agencies of local government and provides for the allocation of powers among them. *Cheeks,* 287 Md. at 606, 415 A.2d 255. We there explained that a charter is a permanent document providing a broad organizational framework establishing the form and structure of government in pursuance of which the political subdivision is to be governed and local laws enacted. *Id.* at 607, 415 A.2d 255. It establishes basic principles governing relations between the government and the people and among the various governmental branches and bodies. *Id.*

As I see it, the proposed amendments are not addressed to the form or structure of the county government in any fundamental sense and are not, therefore, charter material within the contemplation of § 5 of Art. XI–A of the Maryland Constitution. The substance of what is now before us, under the guise of charter amendments, constitutes nothing more than local laws, which the charter properly entrusts to. the law-making body of the county, and not to the voters through a charter initiative; in other words, it is to the law-making body, and only to that body, which the charter commits the power, in that body's representative capacity, to determine the amounts essential to support and maintain the county government. *See also Griffith v. Wakefield,* 298 Md. 381, 470 A.2d 345 (1984). If the electorate is dissatisfied with the performance of members of the legislative body, the remedy is through the ballot box at the next ensuing popular election.

CHASANOW, Judge, concurring in part and dissenting in part.

The issue decided by the trial courts in the instant case was whether the proposed cap amendments violate Article

XI–A of the Maryland Constitution. The courts below answered that question in the affirmative, and this Court reverses that determination. I concur in Parts I through III of the Court's opinion.

In Part IV, the majority coins the pejorative phrases—"roll backs" and "escape clauses"—and decides that roll backs as well as escape clauses violate a section of the Tax–Property Article and are therefore void. The majority goes on to rewrite the amendments petitioned for by over 20,000 registered voters, replaces them with the Court's cap amendments, and incidentally performs the county councils' function of drafting the form in which the amendments will be placed on the ballot. I respectfully dissent from this part of the Court's opinion.

## ROLL BACK

The majority holds that "roll backs" conflict with Maryland Code (1986, 1991 Cum.Supp.), Tax–Property Article, § 6–302(a) and are therefore invalid. Section 6–302(a) provides:

"(a) *In general.*—Except as otherwise provided in this section and after complying with § 6–305 of this subtitle, in each year after the date of finality and before the following July 1, the Mayor and City Council of Baltimore City or the governing body of each county annually shall set the tax rate for the next taxable year on all assessments of property subject to that county's property tax."

The majority states: "Section 6–302(a) of the Tax–Property Article requires that a county's tax rate be set by the governing body of the county." Majority Op. at 245. Obviously, the majority does not mean that § 6–302(a) grants a county council unlimited discretion to set the tax rate—if so the entire cap amendment would be in conflict with this public general law and, therefore, invalid. The majority must then recognize that the right of the governing body to set the tax rate can be limited through a charter amendment.

None of the cap provisions, including the roll back, purport to deprive the governing body of authority to set property tax rates; however, they do establish a ceiling on the governing body's authority to set the property tax rates. If the right of taxpayers to establish a ceiling does not violate § 6–302(a), it is unclear why some ceilings (*e.g.*, a rate based on revenues 2% over the 1990–91 fiscal year) are held permissible under § 6–302(a) and some ceilings (*e.g.*, a rate based on revenues of the 1989–90 fiscal year or revenues of the 1988–89 fiscal year) are held impermissible under that section. I am sure the majority had the laudable purpose of assuring that the cap, if it went into effect, would not have too drastic an initial impact on tax revenues, but that benevolent purpose does not seem to be codified in § 6–302(a).

By implication, one vice of the "roll back" is the failure, in the first year that the cap would go into effect (tax year 1991–92), to allow the county councils the discretion to increase property tax revenues up to 2% in Baltimore County and up to 4.5% in Anne Arundel County. Although the petitioned amendments provide this discretion commencing the tax year 1992–93 and for all subsequent years, the majority's order changes the petitioned amendments and inserts this discretion in the first year the cap amendments would go into effect.[1]

The second vice of the "roll back" is apparently the choice of the tax base year. The Baltimore County tax base year in the proposed charter amendment was 1989–90. The

---

1. The Baltimore County petitioned amendment had provided that "for the tax year 1992–1993, and for succeeding years the County property tax may be increased, but by no more than 2 percent per year." The majority changed the date the County Council could begin its 2 percent increase from tax year 1992–93 to tax year 1991–92, the date the act would have gone into effect. The Anne Arundel petitioned amendment had provided that, "commencing 1 July 1992, and applicable to subsequent tax years," the Council may increase the tax rate by up to the consumer price index or 4.5 percent whichever is the lesser. The majority changed the date the Council may begin the increase from 1 July 1992 to 1 July 1991, the date the amendment would have gone into effect.

Anne Arundel County proposed charter amendment chose the tax base year of 1988–89. The majority strikes both of these chosen years, and substitutes in both Anne Arundel County and Baltimore County the tax base year 1990–91.

The majority does not explain why freezing the property tax revenues at those of the prior year violates § 6–302(a), "which mandates that the governing body of each county is to set the property tax rate for the next tax year," Majority Op. at 244, but simply giving the council authority to increase those fixed property tax revenues by up to 2% makes the provision valid.[2] Without any explanation of its reasoning, the majority also holds that it is improper under § 6–302(a) to freeze the 1991–92 property tax revenues, and all future tax revenues at no more than 2% per year above the 1989–90 tax year (1988–89 in Anne Arundel County), but it is perfectly all right to simply substitute 1990–91 for 1989–90 and freeze the 1991–92 property tax revenues and all future property tax revenues at no more than 2% per year above the 1990–91 tax year. This, the majority tells us, was the intent of the legislature when they enacted § 6–302(a). I respectfully am unable to read these complex distinctions into that very simple statute.

---

**2.** I hope that the majority is not, without any opportunity for briefing or argument on the point, inadvertently voiding existing cap provisions. *See* Article VI, § 614 of the Talbot County Charter, as amended in 1978, which provides in part:

"[T]he Council may not establish property tax rates which would provide more property tax revenues than were raised during the 1978–79 tax year, unless such additional revenues are the result of assessments on newly constructed property or other property not previously assessed."

*See also* Article VIII, § 817B of the Prince George's County Charter, as amended in 1984, which provides in part:

"(a)(1) Except as provided in this Section 817B, the Council shall not levy a real property tax which would result in a total collection of real property taxes greater than the amount collected in fiscal year 1979;

(2) The Council may levy a real property tax which would result in a total collection of real property taxes greater than the amount collected in fiscal year 1979 if the real property tax rate does not exceed Two Dollars and Forty Cents ($2.40) for each One Hundred Dollars ($100.00) of assessed value."

## ESCAPE CLAUSE

The majority holds that the "escape clause" which allows the county council to increase the property tax revenues above the cap in any given year by referring the increase to the voters for approval is invalid. The reason why the "escape clause" is invalid, we are told by the majority, is again because "§ 6–302(a) of the Tax–Property Article requires that a county's tax rate be set by the governing body of the county." Majority Op. at 245. The Court reasons that, if we allow voters the authority to ratify a council's action in setting a tax rate above the cap in any given year, then "in essence, the voters would be setting the tax rate for that year." Majority Op. at 245. Thus, the majority holds the voters can vote to establish a cap by charter amendment and, in doing so, they *are not* setting the tax rate, but the voters cannot vote to remove the cap in any given year because, in doing so, they *are* setting the tax rate. That could not be the General Assembly's intent.

I believe that, if § 6–302(a) allows the voters to establish a cap, then § 6–302(a) allows the voters to remove the cap either permanently or for any given year by ratifying the council's action in setting a rate above the cap. Interestingly enough, the majority recognizes that there are times when the cap might hamper the basic functioning of government, but instead of allowing the voters to grant relief in such a situation, the majority says, we *the courts,* not the voters, can abrogate the cap. The majority states:

> "If it is subsequently demonstrated in a particular case that a local limitation on property tax revenues so hampers a county government that it cannot perform the duties required under state law, a tax limitation charter provision may well be found to be invalid as applied."

Majority Op. at 244. If the courts have the power to abrogate the tax cap when it so "hampers a county government that it cannot perform the duties required under state law," surely the voters should have the same power. In enacting § 6–302(a), the legislature could not have intended that although the voters have the power to establish a cap,

only the courts, not the voters, have the power to abrogate the cap if it is necessary in any given year.

The Court interprets the simple language of § 6–302(a) that "the governing body of each county annually shall set the tax rate" as 1) allowing the voters to establish a cap; 2) requiring that the cap be based on revenues from the most recent tax year; 3) requiring that the cap authorize at least a 2% per year increase; and 4) prohibiting the voters from granting temporary relief from the cap through an escape clause. The Court reads all this into the statute without the benefit of a single word of legislative history and without any explanation of its interpretive reasoning. In interpreting a statute, courts should use a magnifying glass, not a shoehorn. I am afraid that the Court is not *reading from* § 6–302(a) the cap requirements created by the *General Assembly;* it is instead *reading into* § 6–302(a) the cap requirements created by the *Court.*

### REWRITING THE PROPOSED CHARTER AMENDMENTS

The majority states, "We wish to point out that the Court did not rewrite, to suit itself, the proposed amendments ... we simply deleted the portions of the amendments which we found to be invalid [which] ... necessitated changing some of the dates specified in the proposed amendments...." Majority Op. at 246 n. 16. The Court apparently acknowledges rewriting the proposed amendments, but denies doing so "to suit itself." The changes made by the Court were so substantial that it felt compelled to order that the Court's rewritten amendments be placed on the ballot in substitution for the petitioned amendments endorsed by over 20,000 voters in Anne Arundel County and Baltimore County. What the majority is in effect saying is that they know over 20,000 voters in two counties wanted some tax cap amendment. The amendments petitioned for had invalid provisions, used a wrong tax base year, and failed to provide for county council discretion the first year of operation. The majority did not simply say the petitions were invalid; it

drafted new statutorily permissible cap amendments acknowledging they were substantially different from the petitioned amendments, and ordered the Court's amendments be placed on the ballot. This benevolent paternalistic assumption of judicial authority is, to say the least, unprecedented.

The fiscal effect of the Court's changes is substantial. The Baltimore County Charter Amendment petition signed by over 10,000 voters used the known previously determined property tax revenues realized for the tax year 1989–90 as the property tax base. The Court's amendment used the unascertained 1990–91 property tax revenues as a base. For the tax year 1991–92, instead of the property tax revenues being no more than the 1989–90 revenues, the property tax revenues can be as high as 2% above the 1990–91 revenues. The estimated difference is over 53 million dollars per year in increased property taxes.

In Anne Arundel County, the Charter Amendment petition signed by over 10,000 voters used the known previously determined 1988–89 property tax revenues as the property tax base. The Court's amendment used the unascertained 1990–91 property tax revenues as a base. For the tax year 1991–92, instead of the property tax revenues being no more than the 1988–89 revenues, the property tax revenues can be as high as 4.5% above the 1990–91 revenues. The estimated difference is over 30 million dollars per year in increased property taxes. Consequently, "changing some of the dates" substantially alters the proposed amendments in that each county could collect significantly more property taxes.

Even if the majority had only ordered deletions from the petitioned form of the charter amendments and had not ordered its other changes, the Court would still be totally disregarding its carefully reasoned analysis in *Schneider v. Lansdale*, 191 Md. 317, 61 A.2d 671 (1948), the seminal case in Maryland on enjoining submission of petitioned amendments. In *Schneider*, there was a suit to enjoin the Board of Supervisors of Elections from submitting to the voters

the proposed Montgomery County Charter. The circuit court had determined that two provisions were invalid "but not so inseparable from the other part of the charter as to prevent the remainder from being submitted to the voters." *Id.* at 321, 61 A.2d at 672. The circuit court filed a decree deleting the invalidated provisions and directing the President of the County Commissioners to publish the charter as deleted and the Supervisors of Elections to submit it as deleted at the November election. This Court began its analysis by admonishing circuit court chancellors against doing the same thing the majority does in the instant case— deleting part of an amendment and ordering only the valid portions be submitted to the voters. This Court was emphatic when Chief Judge Marbury, writing for a unanimous Court, stated:

> "The charter, as they have ordered it submitted to the voters, is emasculated, and is not the charter submitted by the Charter Board. We have been referred to no case which authorizes the courts to strike out, before submission, part of a proposed enactment which the people are to vote upon. *If they find such proposal partly invalid they may so hold but they cannot delete the invalid part and submit the remainder.* The only charter which can be submitted, if any, is the one drafted by the Charter Board without deletions." (Emphasis added).

*Id.* at 323, 61 A.2d at 673. The Court also made it clear that, where parts of a petitioned charter or charter amendment are invalid, a court's task is to determine whether the invalid parts are "so inseparable from the remainder that its invalidity makes the whole invalid." *Id.* If the invalid part makes the whole amendment invalid, nothing is submitted to the voters. If the invalid part does not invalidate the entire amendment, the proposed amendment as drafted by the petitioners, not as drafted by the judiciary, is to be submitted to the voters.

In *Rivergate Restaurant Corp. v. Metro Dade Cty.*, 369 So.2d 679 (Fla.App.1979), a Florida circuit court had deleted an invalid provision of a petitioned ordinance. In holding

that the lower court had no power to delete even invalid provisions, the District Court of Appeals stated:

"An individual piecemeal attack upon a portion of the proposal, as opposed to an attack on the proposal in toto, was not sufficient to enable the circuit court to enjoin the election or to delete the language of the proposed ordinance that the court found to be unconstitutionally vague. . . .

In short, the circuit court's authority was restricted to an overall examination of the constitutionality of the proposed ordinance on its face. It fell into error when it went beyond that and determined that a portion thereof was unconstitutionally vague and should be deleted prior to consideration by the electorate." (Footnote omitted).

*Id.* at 683.

Our function in the instant case should be limited to determining whether the proposed amendments could be, if adopted by the voters, legally operative. We should not, at this stage, attempt to determine whether the proposed amendments may have severable but invalid aspects or applications. We certainly should not insert into, delete from, or rewrite the amendments and place the Court's rather than the petitioners' amendments on the ballot. By analogy, the Court may invalidate severable provisions of an enacted statute, but the Court cannot substitute provisions in a statute and cannot order that the statute be republished in the Annotated Code omitting the provisions invalidated by the Court or order republishing of the statute as modified by the Court.

In passing on the validity of the amendments, we should consider them in their entirety. Whether specific segments of the proposal are void should not be considered as long as any potentially invalid provisions are severable and do not invalidate the whole. *See* 5 *McQuillin Mun. Corp.* § 16.69 (3rd ed. 1989). If the Court does examine individual segments, it is improper for the Court to delete even invalid provisions or insert new and different provisions in their

place. The Court should either submit the petitioned amendments as petitioned or enjoin their submission. The amendments as petitioned by the voters, not as interpreted by the courts, should be what is placed on the ballot.

It is ironic that in *Ficker v. Denny,* 326 Md. 626, 606 A.2d 1060 (1992), this Court would not let the people who drafted, circulated, and collected over 10,000 signatures on a charter amendment to elect to substitute for their petitioned amendment a county council amendment which they claimed equally or better met the goals of the signers. This Court refused to allow that substitution quoting with approval from *Monplaisir v. Katz,* 26 A.D.2d 804, 805, 273 N.Y.S.2d 839, 841, *aff'd sub nom. Cassese v. City Clerk of New York,* 18 N.Y.2d 813, 275 N.Y.S.2d 523, 222 N.E.2d 389 (1966) that: "Electors have the right to vote on validly submitted propositions even if confusion may be a consequence." *Id.* 326 Md. at 630 n. 2, 606 A.2d at 1062 n. 2. Yet in the instant case, the Court does not allow the voters to vote on the "validly submitted propositions;" instead, it substitutes its own formulation of the amendments apparently to avoid voter confusion.

In directing that each county's Board of Supervisors of Elections submit the cap amendments to the voters "in the following form," this Court also usurped a legislative function and violated a statutory mandate. It is quite clear that the county councils, *not* the courts, prepare and certify the form that charter amendments appear on the ballot. Md. Code (1957, 1990 Repl.Vol.), Art. 33, § 16–6(a) is clear and direct. It provides:

"The county commissioners, county councils, or treasurer of Baltimore City, as the case may be, shall prepare and certify to the boards the form in which local questions shall appear on the ballots."

*See also* Md.Code (1957, 1990 Repl.Vol.), Article 33, § 23–1(a) and *Anne Arundel Co. v. McDonough,* 277 Md. 271, 354 A.2d 788 (1976).

AMENDMENT PETITIONS

The reason given for the Court's deleting from and re-writing the cap amendments in the instant cases is

"submission of an amendment with invalid and severable portions intact would mislead the public during the election by asking them to vote on an amendment which, in its present form, was incapable of becoming part of their charter. We do not believe that it is appropriate to deceive the voters in this fashion."

Majority Op. at 248. The Court implies that its interpretive changes do not substantially change the petitioned amendments, yet acknowledges that the amendments as petitioned would mislead and deceive the voters. If the cap amendments in the exact form petitioned would mislead and deceive the voters, then the 20,000 plus voters who signed those petitions were also misled and deceived and the Court should have found the petitions invalid. *See, e.g., Takoma Pk. v. Citizens for Decent Gov't,* 301 Md. 439, 449–50, 483 A.2d 348, 354 (1984) (holding the referendum petition at issue did not describe the statute under consideration in sufficient detail to advise petition signers, therefore the referendum should not be placed on the ballot). If the amendment petitions in the form in which they were signed are not being substantially modified by the Court, then all of the voters should be able to vote on them in the form that 20,000 voters signed them. If the original amendment petitions signed by over 20,000 voters are in fact misleading and deceptive, then they are obviously invalid. The Court cannot make misleading and deceptive petitions, which were endorsed by over 20,000 voters, valid by rewriting the signed petitions. The cap amendments as modified by the Court clearly were not petitioned for by the voters—they signed amendment petitions which, according to the Court, were misleading and deceptive. This Court has no authority, no matter how good its intentions, to draft and place its own charter amendments on the ballot. The cap charter amendments the majority has ordered placed on the ballot

were not petitioned for by the voters; they were constructed by this Court.

This Court had before it two decisions holding that the cap amendments violated Article XI–A of the Maryland Constitution. This Court quite properly reversed those decisions. The judges below made no attempt to determine whether § 6–302(a) of the Tax–Property Article voided the "roll backs" and "escape clauses." This Court should not have decided those issues or rewritten the amendments. I dissent from Part IV of this Court's opinion.