REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1401

September Term, 2014

_____

JOHN VILES ET AL.

v.

BOARD OF MUNICIPAL AND
ZONING APPEALS

_____

Kehoe,
Hotten,*
Reed,

JJ.

_____

Opinion by Kehoe, J.

_____

Filed:  October 27, 2016

*The Hon. Michele D. Hotten participated in the conference of this case while an active member of this Court but did not participate in the adoption of this opinion.

As land use disputes go, the relevant facts in this case are mercifully simple. The legal issues are a different matter.

This appeal arises out of a 2013 decision by the Baltimore City Planning Commission to modify some of the terms of a planned unit development that had been established by the Baltimore City Council in 2010. John Viles, together with several other individuals opposed to the modifications, appealed the Commission's decision to the Board of Municipal and Zoning Appeals of Baltimore City. The Board declined to address the merits of their claims because it concluded that it did not have the authority to review decisions of the Planning Commission. Appellants then filed the current case, a judicial review action challenging the Board's decision. The Circuit Court for Baltimore City affirmed the Board. The appellee is the Mayor and City Council of Baltimore.

Appellants present two issues, which we have reordered and reworded:

> 1. Did the Zoning Board have jurisdiction to review the Planning Commission's action?
> 2. Does Baltimore City Zoning Ordinance § 9-118(c) give the Planning Commission authority to modify the terms of a planned unit development?

We answer "yes" to the first question. As we will explain, Md. Code Ann. (2012) § 10-404(a) of the Land Use Article ("LU") authorizes the Board to hear appeals "when it is alleged that there was an error in any . . . determination made by an administrative official" pertaining to "any local law adopted" pursuant to the General Assembly's grant of land use and zoning authority to the City. BCZR § 9-118(c) is such a local law. Additionally, the Planning Commission functions in an administrative capacity when it approves or denies design modifications to existing PUD developments because those

– 1 –

decisions are focused on single properties or discrete assemblages of properties. The City

also contends that Article VII § 86 of the City Charter trumps the General Assembly's

grant of authority to the Board but this contention: (1) is based on an erroneous

interpretation of the language in § 86; and (2) in any event, is irreconcilable with long-

established legal principles relating to the relationship between local government charters

and public general laws.

We will not address the second issue because appellants' arguments as to the validity

of § 9-118(c) should be presented first to the Board.[1]

---

[1] We will briefly address two preliminary matters.

*First,* in its brief, the City moved to dismiss the appeal as moot. The City's mootness theory was based on a change in ownership of the property subject to the PUD approval, and an indication from the new owner that it did not intend to develop the property in accordance with the PUD. The City sought to withdraw the motion after oral argument. Although the parties' views as to mootness are not binding on a court, we agree that the appeal is not moot because the owner expressed its non-binding intent to develop the property in a different way. *See Carroll County Ethics Comm'n v. Lennon,* 119 Md. App. 49, 61 (1998) ("[V]oluntary cessation of a challenged practice does not deprive [a court] of its power to determine the legality of the practice." (quoting *City of Mesquite v. Aladdin's Castle, Inc*., 455 U.S. 283, 289 (1982)).

*Second,* appellants filed a motion to strike parts of the appendix to the City's brief, either because they are not in the record, or for other reasons. The only part of the motion that has any colorable merit pertains to three documents in the City's appendix:

1. A memorandum of law presented by appellants to the Director of the Planning Commission pertaining to the Commission's authority to grant modifications to PUDs.

2. A portion of the Baltimore City Charter Revision Commission Final Report (1994).

3. A copy of the ordinance approving the 25th Street Station PUD.

(footnote continued . . .)

**Background**

In 2010, the Baltimore City Council enacted Ordinance No. 10-397, which established a PUD, called the "25th Street Station PUD," on an eleven acre parcel located in the Remington and Charles Village neighborhoods.[2] In 2013, the Planning Commission considered and approved an amendment to the PUD design occasioned by a decision of a proposed major tenant to leave the development. The Planning Commission's approval was made pursuant to § 9-118(c) of the BCZC.[3] Whether § 9-118(c)'s grant of authority to the Commission is valid is a matter of contention between the parties.

Appellants appealed the Commission's decision to the Board. The Board held a hearing, but did not reach the merits of appellants' contentions. Instead, the Board

---

We grant the motion as to the first document. *See Cochran v. Griffith Energy Service, Inc.*, 191 Md. App. 625, 663 (2010) ("[A]n appellate court must confine its review to the evidence actually before the [agency] when it reached its decision.").

The latter two documents are publicly available legislative material, of which we may, and do, take judicial notice. *Park v. Board of Liquor License Com'rs for Baltimore City*, 338 Md. 366, 383 n.8.

[2] In *Ray v. Mayor and City Council of Baltimore*, 203 Md. App. 15 (2012), *aff'd* 430 Md. 74 (2013), we provide additional information about the proposed development and the opposition to it.

[3] BCZC § 9-118(c) states:

(c) Minor modifications – design features; interiors
 (1) The Planning Commission may authorize minor modifications that:
    (i) are limited to design features and interior planning; and
    (ii) do not include any change in the applicable density or bulk
    regulations
(2) The Planning Commission may determine what constitutes a "minor modification" for purposes of this subsection.

– 3 –

decided that it did not have the authority to consider appeals from decisions by the Planning Commission. Its conclusion was based on Article VII, § 86 of the City Charter[4] which states (emphasis added):

> The Board shall have such additional powers to examine, review and revise acts or rulings of other departments and officers of the City affecting the construction, alteration, use or operation of land or buildings in the City or other charges as may from time to time be conferred upon it by law, but the powers conferred upon it in the Charter shall not be diminished or abridged by ordinance, <u>nor may the Board be given power to review or alter determinations of the Planning Commission</u>.

Appellants filed a petition for judicial review in the circuit court, which affirmed the Board's decision.

## I. The Standard of Review

In judicial review cases, an appellate court reviews the agency decision, as opposed to the decision of the circuit court. *People's Counsel v. Loyola College*, 406 Md. 54, 66 (2008)*; Para v. 1691 Ltd. P'ship*, 211 Md. App. 335, 354 (2013). The issue decided by the Board is one of law, specifically, the relationship between provisions of the City Charter, on the one hand, and the Land Use Article on the other. In these circumstances, our review is *de novo. See, e.g., Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 528 (2004).

---

[4] Unless otherwise noted, all sections of the Baltimore City Charter discussed in this opinion are found in Article VII.

## II. The Board's Jurisdiction to Review the
## Planning Commission's Decision

During the hearing before the Board, appellants argued that the Board had jurisdiction to hear their appeal pursuant to LU § 10-404(a)(1), which authorizes the Board to:

> hear and decide appeals when it is alleged that there was an error in any order, requirement, decision, or determination made by an administrative official or unit under [Land Use Article Title 10] or any local law adopted under [Title 10].

They further contended that the Planning Commission was acting as an administrative official under Title 10 when it approved the modification to the PUD, and thus the Board had jurisdiction to hear this appeal. {E. 196.}

The Board concluded that it lacked jurisdiction. It cited § 86 of the Charter, interpreting the language that the Board may not "be given power to review or alter determinations of the Planning Commission," to mean that the Board is without authority to review decisions of the Planning Commission. {E. 197.} It reasoned that, even if the Planning Commission was acting as an "administrative official" under LU § 10-404(a)(1), the Charter took precedence over the Land Use Article and limited the scope of the Board's jurisdiction. {E. 197.}

### A. *Some Historical Context*

Land use control came to Maryland in fits and starts. The earliest decision of the Court of Appeals that considered the validity of a local law that functioned in a manner analogous, at least in some respects, to a modern zoning code appears to be

*Commissioners of Easton v. Covey*, 74 Md. 262, 267–69 (1891), in which the Court

upheld an ordinance that authorized the town commissioners to deny a building permit if

doing so was necessary *"to protect the safety of property and the best interests of the*

*town*[.]" (Emphasis in original.) [5] In 1923, Baltimore enacted Maryland's first

comprehensive zoning ordinance.  Garrett Power, *The Unwisdom of Allowing City*

*Growth to Work Out Its Own Destiny*, 47 MD. L. REV. 626, 633 (1988). The use

regulations of the ordinance were struck down by the Court of Appeals on substantive

due process grounds in *Goldman v. Crowther*, 147 Md. 282, 309 (1925). However, one

year later, the United States Supreme Court issued its landmark decision in *Village of*

*Euclid v. Amber Realty*, 272 U.S. 365, 395 (1926), in which the Court rejected a

substantive due process challenge to a zoning ordinance.[6]

---

[5] In 1912, the General Assembly prohibited all dwellings, other than detached, single family residences, in certain areas of Baltimore. *See* Chapter 693 of the Acts of 1912. The statute was declared unconstitutional on substantive due process grounds in *Bryne v. Maryland Realty Co.*, 129 Md. 202, 214 (1916).

[6] In *Crowther,* the Court explicitly did not address the height, bulk, area and density provisions of Baltimore's zoning ordinance. 147 Md. at 309. In *R.B. Construction Co. v. Jackson*, 152 Md. 671, 678 (1927), and relying on *Village of Euclid*, the Court upheld these regulations against a substantive due process challenge.

Informative discussions of Baltimore's initial efforts at zoning can be found in Professor Power's article cited in the main text at 47 MD. LAW REV. 627–33, and Joshua Gordon, *A Euclid-Turn: R.B. Construction Co. v. Jackson and the Zoning of Baltimore*, 22 MARYLAND HISTORIAN 26 (1991). Finally, the City's initial efforts at land use control were undertaken in the context of its earlier attempts to segregate housing by race. This story is told in Garrett Power, *Apartheid Baltimore Style: the Residential Segregation Ordinances of 1910–1913,* 42 MD. L. REV. 288 (1983).

In 1927, the General Assembly enacted Chapter 705 of the Laws of 1927, which added Article 66B to the Maryland Code. Chapter 705 applied only to Baltimore City and other cities with populations of more than 10,000. Robert J. Carson, *Reclassification, Variance and Special Exceptions in Maryland*, 21 MD. L. REVIEW 306, 307 (1961). Chapter 705 was eventually codified as MD. ANN. CODE Article 66B §§ 2.01–2.13 (1957, 2010 Repl. Vol., 2014 Supp.). In the same year, the legislature also enacted what is today known as the Regional District Act, which provided for the exercise of planning and zoning authority in the Maryland-Washington Regional District, which originally was, more or less, the area that now lies within the Capital Beltway in Montgomery and Prince George's Counties.[7]

In 1933, the General Assembly enacted a statute, sometimes referred to as the Maryland Zoning and Planning Enabling Act, which amended Article 66B by adding provisions that authorized all municipalities to enact and administer planning, zoning and subdivision control regulations. Chapter 599 of the Acts of 1933. (The scope of this statute was later extended to non-charter counties.) Section 28 of this statute contained a blanket repeal of any provision in a statute or local ordinance that was inconsistent with its terms, except that:

---

[7] A detailed analysis of the Regional District Act is beyond the scope of this opinion. We refer the curious reader to Judge Harrell's thorough and scholarly discussion of the history of the Act in *Prince George's County v. Zimmer Development Co.*, 444 Md. 490, 523–30 (2015).

Chapter 705 of the Acts of 1927 and all laws and ordinances passed pursuant thereto shall not be affected . . . and that this Act shall be deemed to be in addition to said Chapter 705 . . . and not in substitution therefor.

Section 28's direct descendant is LU § 10-103.[8] Section 10-103 lies at the heart of the controversy between the parties.

In addition, the General Assembly enacted local public laws which authorized some counties to exercise zoning powers. *See Baltimore County v. Missouri Realty Co.,* 219 Md. 155, 158 (1959); *Murray v. Director of Planning*, 217 Md. 381, 384–86 (1958).

There is another aspect to the historical background. In 1915, the voters ratified Article XI-A to the Maryland Constitution, which permitted the City of Baltimore and the state's counties to elect a "home rule" form of local government. The purpose of Article XI-A was to allow the authority to enact legislation affecting purely local matters to devolve from the General Assembly to those counties, and Baltimore City, when and if those jurisdictions wished to assume that responsibility by enacting a locally-approved county charter. *County Commissioners of Montgomery County v. Supervisors of Elections*, 192 Md. 196, 204 (1949). In 1918, and pursuant to a mandate contained in

---

[8] Land Use § 10-103 reads in pertinent part as follows:

> **Limited application of division.**
> (a) *In general.* — Except as provided in this section, this division does not apply to Baltimore City.
> (b) *Provisions applicable to Baltimore City.* — The following provisions of this division apply to Baltimore City:
> (1) this title;
> . . .
> (15) Title 7, Subtitle 1 (Development Mechanisms)[.]

Article XI-A § 2, the General Assembly enacted the Express Powers Act to designate

local legislative powers that could be exercised by charter counties. *Montgomery County*

*Council v. Garrott*, 243 Md. 634, 644 (1966). The Act specifically authorized charter

counties to enact zoning regulations. Md. Code Article 25A § 5(X) (1957).[9]

The Express Powers Act does not apply to the City of Baltimore. This is because

Article 11-A of the Maryland Constitution reserved to the General Assembly the

authority to grant and limit the local legislative powers exercised by the City. Article 11-

A § 2 states in pertinent part:

> [T]he powers heretofore granted to the City of Baltimore, as set forth in
> Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged
> or extended by any charter formed under the provisions of this Article, but
> such powers may be extended, modified, amended or repealed by the
> General Assembly.

The Code of Local Public Laws of Baltimore no longer contains the powers

enumerated in Article 4 § 6. Instead, they are now found in Article II of the Baltimore

City Charter. *See* Dan Friedman, THE MARYLAND STATE CONSTITUTION: A REFERENCE

GUIDE 220 (2006).

In conclusion, local governments that exercise zoning authority fall into one of four

categories: (1) Baltimore City; (2) the charter counties; (3) Montgomery and Prince

George's Counties; and (4) municipalities and the non-charter counties.

---

[9] Former Article 25A § 5(X) is now codified as Local Government Article § 10-324.

In 2012, the Department of Legislative Reference, working under the supervision of the Land Use Article Review Committee, completed the herculean task of gathering this widely scattered body of law, reorganizing it, and rewording many of the statutes to delete obsolete and redundant terminology. As part of this effort, what had been Article 66B §§ 2.01–2.13—that is, the zoning enabling statute for Baltimore—was repealed and reenacted as Title 10 the Land Use Article. However, as the General Revisor's Note to the Land Use Article makes clear, "the enactment of the article in no way is intended to make any change to the substantive law of Maryland." We now turn to the parties' specific contentions.

### B. Land Use Article § 10-404(a)

Appellants contend that the Board's authority to consider this appeal is derived from LU § 10-404(a)(1), which states:

> (a) The Board may:
> (1) hear and decide appeals when it is alleged that there was an error in any order, requirement, decision, or determination made by an administrative official or unit under this title or any local law adopted under this title[.]

Appellants cite *Queen Anne's Conservation, Inc. v. County Comm'rs of Queen Anne's County*, 382 Md. 306 (2004), and *Wharf at Handy's Point, Inc. v. Dep't of Natural Res.*, 92 Md. App. 659, 610 (1992), as authority for their contentions that the Planning Commission qualifies as an administrative official, and that its approval of the PUD modification qualifies as a decision made pursuant to Title 10 of the Land Use Article.

*Handy's Point* supports the first leg of appellants' argument. One issue in that case was whether the Kent County Planning Commission, as a multi-member entity, could be an "administrative official" for the purposes of what was then Article 66B § 4.07.[10] Section 4.07(d) stated (emphasis added):

> § 4.07 (d) *General powers*. — The board of appeals shall have the following powers: (1) To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination <u>made by an administrative official</u> in the enforcement of this article or of any ordinance adopted pursuant thereto.

This Court, citing *Howard Research v. Concerned Citizens*, 297 Md. 357, 363-66 (1983) and 64 Op. Att'y Gen. 349, 355 n.4 (1979), concluded that the term "administrative official," for purposes of the zoning enabling act, includes:

> whatever administrative mechanism a local jurisdiction in Maryland sets up to enforce its planning and zoning laws and ordinances, including a multi-member body such as a local planning commission.

*Handy's Point*, 92 Md. App. at 672. Thus, this Court concluded that the term "administrative official" includes Planning Commissions.

One of the issues in *Queen Anne's Conservation* was whether opponents to a development in Queen Anne's County were required to exhaust their administrative remedies before filing a circuit court action challenging a decision by the County Commissioners to approve a development rights and responsibilities agreement (a "DRRA"). 382 Md. at 311. One aspect of the problem confronting the Court of Appeals

---

[10] The previous Art. 66B § 4.07 is now codified as Land Use §§ 4-301–4-306.

was whether the County Commissioners acted in a legislative or in an administrative capacity when they approved the agreement. *Id.* If the Commissioners were acting in an administrative capacity, then the county board of appeals had the authority to review the Commissioners' decision because Article 66B § 4.07(d)[11] authorized the county's board of appeals to "decide appeals where there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement" of the county zoning ordinance. 382 Md. at 321.

The Court of Appeals noted that a single entity may exercise different functions, some of which may be characterized as "legislative" while others will be classified as "executive and administrative." *Id.* at 322. The Court went on to clarify that the proper test for determining whether an action is legislative on the one hand or executive or administrative on the other is that a legislative act "is one making a new law—an enactment of general application prescribing a new plan or policy"; while an administrative or executive act is one that "merely looks to or facilitates the administration, execution or implementation of a law already in force and effect[.]" *Id.* at 326. The Court concluded that the Commissioners were acting in an administrative capacity when they approved the DRRA. *Id.* at 328–29.

---

[11]Section 4.07(d) stated in pertinent part:

> *General powers.* — The board of appeals shall have the following powers:
>
> (1) To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this article or of any ordinance adopted pursuant thereto.

Applying the reasoning in *Handy's Wharf* and *Queen Anne's Conservation*, we reach the following conclusions: (1) the Baltimore Planning Commission is an "administrative official" for the purposes of LU § 10-404(a)(1); and (2) the Commission's decision to approve the modifications to the 25th Street Station PUD was an administrative one because the decision of the Planning Commission clearly was limited to design changes within the 25th Street Station PUD property. *Cf. Maryland Overpak Corp. v. Mayor and City Council of Baltimore*, 395 Md. 16, 53–54 (2006) (A decision by the Baltimore City Council to amend the design and density of a mixed-use PUD was quasi-judicial, as opposed to legislative, in nature.). Thus, the plain language of § 10-404(a) authorizes the Board to review the Planning Commission's decision.

To avoid this result, the City presents three arguments. We will discuss them in turn.

*(1) The Scope of the Board's Authority Under § 10-404(a)(1)*

The City asserts that the Commission's decision falls outside of § 10-404(a)(1)'s purview because that subsection limits the scope of the Board's review to those decisions issued "under [Title 10] or any local law adopted under [Title 10]."[12] The City contends that the Planning Commission's authority to modify PUDs is not derived from Title 10 of

---

[12] Section 10-404(a) reads in pertinent part (emphasis added):

§ 10-404. Board--Authority

(a) The Board may:

(1) hear and decide appeals when it is alleged that there was an error in any order, requirement, decision, or determination made by an administrative official or unit <u>under this title</u> or any local law adopted under this title[.]

the Land Use Article, but rather from Title 7, specifically LU § 7-101(a)(6),[13] which authorizes local governments to enact laws that provide for planned unit developments. The City's argument cannot be squared with the relevant provisions of the Land Use Article for two reasons.

First, LU § 10-301(b)(15) explicitly states that the provisions of "Title 7, Subtitle 1 (Development Mechanisms)" of the Land Use Article applies to Baltimore City. Section 7-101 authorizes local jurisdictions to enact, among other land use controls, provisions for "planned unit developments." LU § 7-101(6). We read Title 10 as incorporating § 7-106 by reference.

Second, LU § 10-404(a)(1) authorizes the Board to hear appeals "when it is alleged that there was an error in any . . . decision . . . made by an administrative official or unit under this title or <u>any local law adopted under this title</u>[.]" (Emphasis added). The Planning Commission's authority to grant modifications to PUD requirements is contained in BCZC § 9-118(c). The BCZC is a "local law" as that term is used in the

_____

[13] Land Use § 7-101 states in pertinent part:

> To encourage the preservation of natural resources or the provision of affordable housing and to facilitate orderly development and growth, a local jurisdiction that exercises authority granted by this division may enact, and is encouraged to enact, local laws providing for or requiring:
>
> . . . .
>
> (6) planned unit developments[.]

Land Use Article, *see* LU 1-101(j),[14] and the BCZC was adopted pursuant to authority granted to the City by what is now LU § 10-301.[15]

*(2) An Administrative Adjustment?*

The second argument made by the City is that the PUD modification is an "administrative adjustment" as described in LU § 4-205,[16] and that, pursuant to § 4-

---

[14] Land Use § 1-101(j) defines "local law" as:

(j)(1) "Local law" means an enactment of the legislative body of a local jurisdiction, whether by ordinance, resolution, or otherwise.

(2) "Local law" does not include a public local law.

[15] The statute states:

**§ 10-301. Districts and zones**

**In General**

(a) The Mayor and City Council of Baltimore City may divide Baltimore City into districts and zones of any number, shape, and area as they determine are best suited to carry out the purposes listed in § 10-302 of this subtitle.

**Authorized action within districts and zones**

(b)(1) Within the districts and zones, the Mayor and City Council of Baltimore City may regulate the construction, alteration, repair, or use of buildings, structures, or land.

(2)(i) Zoning regulations adopted by the Mayor and City Council of Baltimore City under this subtitle shall be uniform for each class or kind of development throughout each district or zone.

(ii) Zoning regulations in one district or zone may differ from those in other districts or zones.

[16] Land Use § 4-205 states in pertinent part:

**Types of requirements**
(a) A legislative body may authorize the planning director or another designee to grant an administrative adjustment from the following requirements in a zoning law enacted by the legislative body:
(1) height;

(footnote continued . . .)

205(f), the local legislative body has discretion to choose whether to authorize the Board to hear appeals from these types of decisions. The legislative history of what is now § 4-205 undercuts the City's argument. The statute was passed as Senate Bill 427 of the 2000 session of the General Assembly and enrolled as chapter 427 of the Laws of 2000. SB 427 was sponsored by then Senator, and now Attorney General, Brian Frosh on behalf of the Article 66B Study Commission. The Fiscal Note to SB 427 indicates that the concept of "administrative adjustments" had nothing to do with planned unit developments but was rather intended to provide a means by which property owners could obtain minor and non-controversial adjustments to height, bulk and similar requirements without the expense of applying for a variance. *See* Fiscal Note at 2–3.

Additionally, before a local government can provide for administrative adjustments, LU § 4-205(c) requires that the local legislative body adopt criteria for granting

---

(2) setback;
3) bulk;
(4) parking;
(5) loading, dimensional, or area; or
(6) similar requirements.

. . . .

**Criteria**
(c) The criteria for an administrative adjustment shall include:
(1) standards for actions on requests;
(2) standards for the classes of development that are eligible for an administrative adjustment; and
(3) the maximum variation from a zoning requirement that is allowed under an administrative adjustment.

. . . .

applications. BCZC § 9-118(c) contains no such criteria and the City points to nothing elsewhere in the BCZC that does.

*(3) The Effect of the City Charter*

The City's final argument is that § 86 of the Charter precludes the Board from considering any decision of the Planning Commission.

The City's argument is a non-starter because the provisions of local government charters cannot preempt public general laws such as LU § 10-404(a)(1). The case law on this point is indisputable. *See, e.g., Board of Sup'rs of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220, 242 (1992) ("When a provision in a county charter conflicts with a public general law, the public general law prevails under Art. XI–A, § 1."); *Montgomery County v. Bd. of Supervisors of Elections for Montgomery County,* 311 Md. 512, 514 (1988) *("*The Maryland Constitution, Article XI–A, § 1, provides *inter alia* that a county charter shall be subject to the public general laws of Maryland. If a provision of a county charter, including a charter amendment, conflicts with any public general law, the charter provision may not be given effect."); *Rosecroft Trotting & Pacing Ass'n, Inc. v. Prince George's County*, 298 Md. 580, 598 (1984) ("Const. Art. XI–A, § 2, after providing that '[t]he General Assembly shall by public general law provide a grant of express powers,' further provides that 'such powers may be extended, modified, amended or repealed by the General Assembly.'").

Moreover, we do not believe it necessary to resolve any conflict between § 86 of the Charter and § 10-404(a)(1) of the Land Use Article, because there is no conflict.

Section 86 states (emphasis added):

> The Board shall have such additional powers to examine, review and revise acts or rulings of other departments and officers of the City affecting the construction, alteration, use or operation of land or buildings in the City <u>or other charges as may from time to time be conferred upon by law</u>, but the powers conferred upon it by the Charter shall not be diminished or abridged by ordinance, <u>nor may the Board be given the power to review or alter determinations of the Planning Commission</u>.

As the authority granted the Board in § 10-404(a)(1) clearly falls into the category of "other charges as may from time to time be conferred upon by law," § 86 of the Charter supports the City's position only if that section has the legal effect of limiting the General Assembly's authority to enact legislation pertaining to the City. But this is not the function of a local government charter.

Maryland case law has "repeatedly explained that a county charter is equivalent to a constitution." *Save Our Streets v. Mitchell*, 357 Md. 237, 248 (2000); *see also Smallwood*, 327 Md. at 237; *Haub v. Montgomery County*, 353 Md. 448, 450 (1999); *Bd. of Election Laws v. Talbot County*, 316 Md. 332, 341 (1989). Thus, the "basic function" of the charter is to "distribute power among the various agencies of [local] government, and between the [local] government and the people who have delegated that power to their government." *Save Our Streets*, 357 Md. at 248 (quoting *Smallwood*, 327 Md. at 237.). In other words, a charter does not change the balance of power between a local jurisdiction and the General Assembly.

Section 86 of the Charter states that the Board may not be <u>given</u> the power to review or alter determinations of the Planning Commission; § 86 does not state that the Board is

without power to review Planning Commission determinations. Who is it then, that may not give power to the Board to review the Planning Commission's decisions? The answer must be the City. It is certainly not the General Assembly. Any other answer would stand the rule articulated in *Smallwood*, *Rosecroft Trotting & Pacing Assn, Inc.,* and other cases on its head.

Because a charter provision that conflicts with a general public law must yield to the general public law, the City Charter provision cannot restrict the power of the General Assembly to pass public local laws that affect the City. Accordingly, we interpret the language of § 86 of the City Charter to mean that the City Council may not authorize the Board to consider decisions by the Planning Commission, but it does not preclude the General Assembly from providing the Board with this power. And, as we have explained, LU § 10-404(a)(1) confers upon the Board to authority to hear appeals from decisions of the Commission when it administers provisions of the BCZR.

Finally, the City cites to *City of Baltimore v. Princeton Const.*, 229 Md. 176 (1962) and *Windsor Hills Imp. Ass'n v. Mayor & City Council of Baltimore*, 195 Md. 383 (1950), which it argues collectively held that the Board is without authority to consider decisions of the Planning Commission. The difficulty with the City's argument is that both *Princeton* and *Windsor* predate the General Assembly's enactment of Title 10's predecessor, Section 2 of Article 66B, which was enacted in 1970. Chapter 672 of the Laws of 1970 amended Article 66B by adding § 2.08—the predecessor to LU § 10-404(a)(1)—to expressly grant to the Board authority to decide appeals "where it is

– 19 –

alleged there is an error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this article or any ordinance adopted pursuant thereto." Thus, when the Court of Appeals decided *Princeton* and *Windsor*, there was no statutory right to appeal an administrative decision of the Planning Commission to the Board. Notably, the City cites no cases that state the City is without authority to consider Planning Commission decisions after 1970. *Princeton* and *Windsor* are no longer apposite to the issue before us.

In summary, because the Planning Commission was acting in an administrative capacity when it approved the design modifications to the PUD, appellants had the right of appeal to the Board via LU § 10-404(a)(1). This right was not foreclosed by § 86 of the Charter. The Board erred in dismissing appellants' appeal for lack of jurisdiction.[17]

---

[17] There is another provision of the Land Use Article that at first glance appears to be relevant but actually isn't.

LU § 10-203 states (emphasis added):

> The powers granted to the Mayor and City Council of Baltimore City under this title do not:
>
> . . . .
>
> (3) authorize the Mayor and City Council or the officers of Baltimore City to engage in any activity that is beyond their power under any other public general law or public local law or otherwise.

If "otherwise" includes the Baltimore City Charter, then § 10-203 might limit the Board's authority to consider decisions by the Planning Commission through the authority provided by § 10-404(a)(1). However, the legislative history of § 10-203 suggests a different result.

(footnote continued . . .)

What is now § 10-203 was first enacted as part of Chapter 395 of the Laws of 1983. Among other things, Chapter 395 added subsection (b) to what was then codified as Article 66B § 2.01. The amended statute read as follows:

(a) *Grant of powers. —* For the purpose of promoting the health, security, general welfare, and morals of the community, the Mayor and City Council of Baltimore City are hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, off-street parking, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, signs, structures, and land for trade, industry, residence, or other purposes.

(b) *Statement of policy; construction of powers. —* (1) It has been and shall continue to be the policy of this State that the orderly development and use of land and structures requires comprehensive regulation through implementation of planning and zoning controls.

(2) It has been and shall continue to be the policy of this State the planning and zoning control shall be implemented by local government.

(3) To achieve the public purposes of this regulatory scheme, the General Assembly recognizes that local government action will limit free business enterprise and competition by owners and users of property.

(4) It is the policy of the General Assembly and of this State that competition and enterprise shall be so limited for the attainment of the purposes of the State policy for implementing planning and zoning controls as set forth in this article and elsewhere in the public local and public general law.

(5) The powers granted to the Mayor and City Council of Baltimore City pursuant to this subsection shall not be construed:

(i) To grant to the Mayor and City Council powers in any substantive area not otherwise granted to the Mayor and City Council by other public general or public local law;

(ii) To restrict the Mayor and City Council from exercising any power granted to the Mayor and City Council by other public general or public local law or otherwise;

(footnote continued . . .)

(iii) To authorize the Mayor and City Council or its officers to engage in any activity which is beyond their power under other public general law, public local law, or otherwise; or

(iv) To preempt or supersede the regulatory authority of any State department or agency under any public general law.

The preamble to Chapter 395 states that it was enacted as a result of the General Assembly's perception that units of local government were subject to "unanticipated and, in some respects, unclear liabilities under the federal antitrust laws" as a result of two decisions of the United States Supreme Court, *Community Communications Co. v. City of Boulder*, 455 U.S. 40 (1982), and *City of Lafayette v. Louisiana Power & Light Co*., 435 U.S. 389 (1978).

In very brief summary, *City of Lafayette* held that the "state action exemption" to antitrust claims first recognized in *Parker v. Brown*, 317 U.S. 341, 350–51(1943), did not extend to local governments unless the alleged anticompetitive conduct was "engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." 435 U.S. at 413. In *City of Boulder*, the Court held that a general grant of "home rule" authority by a state to local governments was an insufficient basis to conclude that a city's anticompetitive practices were in furtherance of a state policy to displace competition. 455 U.S. at 52–53.

The only purpose of Chapter 395 was to make it clear that a local government's exercise of zoning authority was, in fact, in furtherance of state policies that might have the effect of limiting competition. To drive the point home, the preamble to the statute stated (emphasis added):

It is the purpose of the General Assembly <u>not to grant local governments powers</u> in any substantive area not otherwise granted them under existing law, <u>and not to restrict local governments from executing powers</u> granted them by existing law, but to <u>confirm existing powers</u> of local governments to displace or limit competition with respect to the subjects dealt with herein.

(footnote continued . . .)

Because the Board never reached the merits of appellants' appeal, we will order the case to be remanded to the Board so that it can have the first opportunity to address this question. This is consistent with the general principle that courts do not ordinarily initially address a controversy when the legislature has provided an administrative remedy. *See United Ins. Co. of Am. v. Maryland Ins. Admin.*, ___ Md. ___, No. 101, September Term, 2015, 2016 WL 4499175, at \*4–5 (Aug. 25, 2016) ("[T]his Court has 'ordinarily construed the pertinent [legislative] enactments to require that the administrative remedy be first invoked and followed' before resort to the courts." (quoting *Maryland Reclamation Associates, Inc. v. Harford County*, 342 Md. 476, 493 (1996)); *Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 658 (2004) ("Exhaustion applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." (internal quotation marks omitted)).

The circuit court should remand this case to the Board so that the Board can consider appellants' substantive contentions.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS REVERSED AND THE CASE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.**

---

Article 66B § 2.01(b) is now codified as LU §§ 10-201, 10-202 and 10-203. We conclude that the phrase "or otherwise" in LU § 10-203 does not mean that § 86 of the Baltimore City Charter restricts the authority granted to the City by LU § 10-404.